Argued and submitted December 10, 2010, affirmed on Amerititle's appeal; on Peterson's cross-appeal, reversed and remanded on misrepresentation claim; otherwise affirmed April 18, petition for review denied October 4, 2012

(352 Or 564)

Robert PETERSON,
*Plaintiff-Respondent*
*Cross-Appellant,*

*v.*

Mark E. McCAVIC,
an individual;
Kristi McCavic,
an individual;
and Columbia River Electric, Inc.,
an Oregon corporation,
*Defendants,*

*and*

AMERITITLE, INC.,
an Oregon corporation,
*Defendant-Appellant*
*Cross-Respondent.*

Bruce FLETCHER
and Judith Fletcher,
*Plaintiffs,*

*v.*

Robert PETERSON,
*Defendant.*

Robert PETERSON,
*Third-Party Plaintiff-Appellant*
*Cross-Respondent,*

*v.*

Mark E. McCAVIC,
an individual;
Kristi McCavic,
an individual;
and Columbia River Electric, Inc.,
an Oregon corporation,
*Third-Party Defendants,*

*and*

AMERITITLE, INC.,
an Oregon corporation,
*Third-Party Defendant-Respondent
Cross-Appellant.*

Multnomah County Circuit Court
070201760, 070202244; A139691

277 P3d 572

Jonathan M. Radmacher argued the cause for appellant - cross-respondent Amerititle, Inc. With him on the briefs was McEwen Gisvold LLP.

Gordon T. Carey, Jr., argued the cause and filed the briefs for respondent - cross-appellant Robert Peterson.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Landau, Judge pro tempore.

ORTEGA, P. J.

## ORTEGA, P. J.

Defendant Amerititle, Inc. appeals and plaintiff Robert Peterson cross-appeals a judgment entered on a jury verdict in a case involving a real estate transaction that went bad because the wrong lot was conveyed. Having been found negligent following a jury trial on appeal, Amerititle challenges, among other things, the denial of its motions for directed verdicts on Peterson's negligence claims, the trial court's ruling that allowed Peterson's appraiser to offer an expert opinion on damages, and the trial court's denial of a motion for directed verdict as to Peterson's request for lost profits. Peterson's cross-appeal assigns error to the trial court's grant of summary judgment on his misrepresentation claim, the entry of a directed verdict on his claim for breach of contract, and the entry of a directed verdict on his breach of fiduciary duty claim. On Amerititle's appeal, we write only to address the negligence claims and the request for lost profits and reject Amerititle's remaining contentions without discussion. On Peterson's cross-appeal, we reverse the trial court's grant of summary judgment on Peterson's misrepresentation claim and reject Peterson's remaining contentions without discussion.

The undisputed and procedural facts are these. Peterson planned to purchase an empty lot, build a house, and then sell the property for a profit. That plan was thwarted, however, when it turned out that the lot conveyed to him was different from the one that he had intended to purchase. Unaware of the mix-up, Peterson began building a house on the lot that he did not own but thought he had purchased. Some months later, the owners of the lot sued Peterson for trespass and Peterson, in turn, brought third-party claims against the sellers and Amerititle, which acted as the escrow agent and title insurer for the transaction. Peterson also filed a separate action asserting the same claims against the sellers and Amerititle. The cases were consolidated, and Peterson eventually settled with the sellers and the owners of the lot and proceeded with his claims against Amerititle. After the trial court's pretrial dismissal of a number of Peterson's claims, Peterson's negligence claims went to the jury, which returned a verdict for Peterson.

Amerititle appeals from the judgment entered on the jury verdict, and Peterson cross-appeals the dismissal of three of his claims.

In light of the applicable standards of review, we state the remaining facts in the light most favorable to Peterson. As noted, Peterson decided to buy a lot, build a house, and then sell the property for a profit. He met Mark McCavic, a developer, at River's Edge subdivision to view some empty lots. The subdivision had been platted in two separate phases: Phase I was platted first and contained 15 lots, and 1st Addition was platted several months later and contained 9 lots.[1] The two phases of the subdivision were located adjacent to each other and all of the lots fronted Summit Ridge Drive. At the time, there were no visible markers or monuments delineating the boundaries of the lots in either phase. Notably, Lot 8, Phase I was located about 50 feet from Lot 8, 1st Addition. Peterson viewed Lot 8, Phase I with Mark McCavic and decided to buy it. However, unbeknownst to Peterson, the Fletchers had already purchased that lot several months before. Nevertheless, at Mark McCavic's direction, Peterson proceeded to the local Amerititle office to sign an earnest money agreement to purchase Lot 8, Phase I.

Kristi McCavic (Mark McCavic's wife) prepared and e-mailed the earnest money agreement to Amerititle, whose escrow officer then presented the agreement to Peterson for review. The agreement listed the property as "Lot Number 8 (eight) in the River's Edge Subdivision Phase I in The Dalles, OR." Peterson signed the agreement and deposited the earnest money with Amerititle, which then faxed the agreement with Peterson's signature to Kristi McCavic. She signed it and faxed it back to Amerititle. At some point after Peterson and Kristi McCavic signed the earnest money agreement but before Amerititle's title examiner prepared the preliminary title report, the property description in the earnest money agreement was changed to "Lot Number 8 (eight) in the River's Edge subdivision *1st Addition*, in The Dalles, OR."

---

[1] Mark McCavic owned the property in Phase I and his company owned the property in 1st Addition. Peterson originally sued both parties. For ease of reference, we refer to them collectively as the McCavics in this opinion.

(Emphasis added.) The parties were not informed of the change, nor did they sign a new agreement with the altered description. Instead, the signature page from the original agreement was simply affixed to the page of the altered agreement with the changed property description.

Amerititle prepared a preliminary title report and other closing documents for Lot 8, 1st Addition. A few days later, Amerititle faxed Peterson the closing documents with a cover sheet that stated, in part, "Enclosed please find[ ] closing papers on the purchase of the Lot in Wasco County." Peterson signed them and wired the closing funds to Amerititle. The transaction closed and Peterson became the owner of Lot 8, 1st Addition.

Peterson began building a house on Lot 8, Phase I, which he believed he had purchased in accordance with the original earnest money agreement. Construction continued for several months before the Fletchers, the owners of the lot, informed Peterson of his mistake.

As noted, the Fletchers eventually filed a complaint against Peterson for trespass. Peterson answered and filed a third-party complaint against the McCavics and Amerititle, and asserted identical claims in a separate action. His claims were for indemnity, contribution, breach of contract, breach of the implied duty of good faith and fair dealing, negligence, breach of fiduciary duty, unlawful trade practices, and misrepresentation. After the cases were consolidated, Peterson settled with the Fletchers and the McCavics and proceeded against Amerititle.

Before trial, the court awarded summary judgment to Amerititle on Peterson's claims for indemnity, contribution, unlawful trade practices, and misrepresentation. At the close of the evidence, Amerititle moved for directed verdicts on Peterson's remaining claims. The court granted directed verdicts against Peterson's breach of fiduciary duty and breach of contract claims, but denied Amerititle's motions on the negligence claims. Accordingly, those claims went to the jury. The jury, through use of a special verdict form, indicated that it found Amerititle negligent in (1) receiving the

earnest money agreement but not preparing escrow instructions and closing documents to convey the lot that was subject to the agreement, (2) issuing a title report and title insurance for the wrong lot, (3) not retaining all documents received pertaining to the transaction, (4) destroying or disposing of documents without the knowledge of the parties, and (5) negligently misrepresenting that the property description in the closing documents was an accurate description of the lot that the parties intended to convey. The jury found Amerititle liable and calculated that Peterson suffered damage of $56,904 for expenses and $73,096 for lost profits. The jury concluded, however, that Amerititle was only 45 percent negligent; it also determined that the McCavics were 40 percent negligent and Peterson was 15 percent negligent. Accordingly, the court entered a judgment against Amerititle for $58,500, its share of the damages.

As noted on appeal, Amerititle assigns error to, among other rulings, the trial court's denial of its motions for directed verdicts on Peterson's negligence claims and the trial court's denial of a motion for directed verdict as to Peterson's request for lost profits. Peterson's cross-appeal challenges the trial court's grant of summary judgment on his misrepresentation claim and directed verdicts on his claims for breach of contract and breach of fiduciary duty. We first address the appeal and then the cross-appeal, reversing the judgment on the misrepresentation claim and affirming all of the other rulings.

## I. THE APPEAL

### A. *Negligence*

We begin with Amerititle's first assignment of error, in which it contends that the trial court erred in denying its motion for directed verdict on Peterson's claim that Amerititle was negligent

> "in receiving the parties' earnest money agreement, but not preparing escrow instructions and documents of conveyance therefrom which would effect conveyance of the lot, and in issuing a preliminary title report and title insurance on property the parties did not agree to convey."

"A directed verdict is appropriate only if there is a complete absence of proof on an essential issue or when there is no conflict in the evidence and it is susceptible of only one construction." *Malensky v. Mobay Chemical Corp.*, 104 Or App 165, 170, 799 P2d 683 (1990), *rev den*, 311 Or 187 (1991). When reviewing the denial of a motion for directed verdict, we review the evidence, including any inferences, in the light most favorable to the nonmoving party. *Brown v. J. C. Penney Co.*, 297 Or 695, 705, 688 P2d 811 (1984); *DeNucci v. Henningsen*, 248 Or App 59, 65, 273 P3d 148 (2012). If, after viewing the facts in that light, the moving party is entitled to judgment as a matter of law, then a directed verdict is appropriate. *Wild Rose Ranch Enterprises v. Benton County*, 210 Or App 166, 168, 149 P3d 1281 (2006), *rev den*, 342 Or 504 (2007). The verdict cannot be set aside "unless we can affirmatively say that there is no evidence from which the jury could have found the facts necessary to establish the elements of plaintiff's cause of action." *Brown*, 297 Or at 705.

As a general matter, common-law negligence claims require a showing that the defendant's conduct "unreasonably created a foreseeable risk to a protected interest of the kind of harm that befell the plaintiff." *Fazzolari v. Portland School Dist. No. 1J*, 303 Or 1, 17, 734 P2d 1326 (1987). However, in a negligence action to recover for purely economic losses—like this one—the plaintiff must establish a duty independent of the obligation to avoid foreseeable harm. *Onita Pacific Corp. v. Trustees of Bronson*, 315 Or 149, 159, 843 P2d 890 (1992). To do so, the plaintiff must show a special relationship or status that establishes a duty of care owed by the defendant. *Oregon Steel Mills, Inc. v. Coopers & Lybrand, LLP*, 336 Or 329, 341, 83 P3d 322 (2004).

Amerititle contends that it, as the escrow agent in this transaction, owed no duty to Peterson "with regard to the preparation of documents, and no duty to make sure that the documents accomplish what the parties want them to accomplish." It maintains that its only duty was to follow the escrow instructions, which it insists that it did.

We have addressed, in a number of cases, the existence and scope of a duty of care between an escrow company and a party to the transaction. As a general proposition,

"[a]n escrow holder, by definition, is a neutral party with no obligation to either party to the transaction except to carry out the terms of the escrow instructions. They owe no duty to advise the parties on their legal rights * * * [and] [t]hey have no reason to protect the rights of any one party as against another."

*McDonald v. Title Insurance Co. of Oregon*, 49 Or App 1055, 1059, 621 P2d 654 (1980), *rev den*, 290 Or 727 (1981) (omission and brackets in original); *see also Lindstrand v. Transamerica Title Ins. Co.*, 127 Or App 693, 698, 874 P2d 82 (1994). Beyond that general proposition, however, it is well settled that an escrow holder can assume a duty when it volunteers advice or acts "extra-contractually" outside the scope of its normal duties. *Lindstrand*, 127 Or App at 697-98.

In *McDonald*, we first explained that, although an escrow agent generally owes no duty to the parties other than to carry out the terms of the escrow instructions, when the escrow agent voluntarily chose to offer advice as to a party's responsibility for existing liens, it "assumed a duty of exercising due care in the giving of that advice." 49 Or App at 1059-60.

Later, in *Ivy v. Transamerica Title Insurance Co.*, 90 Or App 511, 514, 752 P2d 1269, *rev den*, 306 Or 195 (1988), we held that, where an escrow agent "undertook extra[-]contractually" to provide the parties with the legal description to be used in the deed and mortgage, the plaintiffs stated a negligence claim when the description provided was incorrect. We concluded that the plaintiffs stated sufficient facts to constitute a claim where they alleged that the agent undertook to provide the legal description with the knowledge and intention that the parties would use the description, the description was wrong, and, as a result, the plaintiffs were damaged.[2] 90 Or App at 514.

Similarly, in *Lindstrand*, we concluded that an escrow agent can owe a duty to a party to a real estate transaction when the agent acts as a "nongratuitous supplier of

---

[2] Contrary to Amerititle's contention, *Ivy* has not been implicitly overruled. *See Oregon Steel Mills*, 336 Or at 341-42 (explaining that common-law principles of reasonable care and foreseeability of harm can be relevant even when a special relationship is the basis of the duty of care owed).

information." 127 Or App at 698. In that case, the escrow agent asked the plaintiffs if they were aware of a height restriction on structures that could be built on the lot that the plaintiffs were purchasing. The agent proceeded to give the plaintiffs a copy of the wrong height restriction, and when the plaintiffs later built a house that exceeded the applicable restriction, they sued the escrow company to recover the costs of construction to modify the house. We concluded that, although the escrow agent was under no obligation to discuss or provide the parties with information about the height restriction, when it elected to do so, it assumed a duty to exercise due care in providing the information. *Id.*

*Bowles v. Key Title Co.*, 163 Or App 9, 986 P2d 1236 (1999)—relied on heavily by Amerititle—does not hold otherwise. In *Bowles*, the plaintiff entered into an agreement to purchase and develop land for a residential development. To ensure appropriate access to the land, the plaintiff entered into a letter of intent to receive an option to purchase additional property from a third party. For the option to become effective, the plaintiff had to perform certain obligations, including the delivery of consideration for the option, by a certain date. The plaintiff failed to do so, and the third party communicated to the escrow agent that the deal was off. The escrow agent did not inform the plaintiff of the third party's communication, and the plaintiff later directed the escrow agent to prepare a form of option agreement. The plaintiff signed the option agreement and deposited the option consideration with the escrow agent. The third party remained uninterested in concluding the transaction and informed the escrow agent of that fact, but the escrow agent did not communicate to the plaintiff the third party's decision not to complete the transaction. The plaintiff proceeded under the assumption that he held the option. Later, when informed that he did not, he sued the escrow company, alleging negligence and breach of contract. In particular, he alleged that the "defendant failed to perform its putative affirmative obligations to consummate [the plaintiff's] bargain with the [third party] and, having failed in that, then failed to perform its putative obligations to inform [the] plaintiff that the * * * transaction had not been consummated." 163 Or App at 14.

On appeal, we concluded that the plaintiff's negligence claim was based on a theory that the escrow agent was somehow responsible for assuring the consummation of the option transaction on the plaintiff's behalf rather than simply acting as a neutral "stakeholder" for the parties. We noted that, although an escrow agent who makes a " 'perfect shambles' of the escrow instructions can be accountable for negligence," the duty in *Bowles* was to hold and dispose of "stakes," so the escrow agent had no responsibility to advise the parties about the status or progress of their dealings. *Id.* at 18. Accordingly, in *Bowles*, we simply recognized the general proposition that an escrow agent's role is to hold and dispose of "stakes" pursuant to the parties' instructions; the agent in that case had assumed no duty to advise the parties about the status or progress of their dealings and relationship with one another. We did not, however, retreat from the proposition that an escrow agent can assume a duty to the parties when it acts "extra-contractually" or outside its normal duty as a holder of "stakes." Moreover, as we noted in *Bowles*, none of our cases has foreclosed the possibility that an escrow agent could be liable for negligence when it makes a "perfect shambles" of the escrow instructions. *Id.* at 18-19.

The evidence here, viewed in the light most favorable to Peterson, established that Peterson and the McCavics signed an earnest money agreement for the sale of Lot 8, Phase I. Amerititle, acting as escrow agent, changed the description of the property to Lot 8, 1st Addition without direction from, notice to, or knowledge of the parties, and then proceeded, based on the change, to prepare closing documents conveying Lot 8, 1st Addition. Thus, there is evidence that, in making the change to the property description in the earnest money agreement and then preparing documents of conveyance based on that change, Amerititle acted outside the normal duties of a neutral stakeholder. When it did so, it had a duty to exercise due care. Accordingly, we cannot conclude that there is no evidence from which a jury could have found the facts necessary to support a duty owed by Amerititle to Peterson.[3]

---

[3] Amerititle contends that imposing a duty of care in this case would equate to imposing a special duty on escrow companies to make sure that the legal

## B.  *The other allegations of negligence*

Amerititle's second and third assignments of error challenge the trial court's refusal to grant a directed verdict on additional specifications of negligence.  However, our rejection of Amerititle's first assignment of error obviates the need to address those additional assignments of error. *See Moe v. Eugene Zurbrugg Construction Co.*, 202 Or App 577, 588, 123 P3d 338 (2005) (if a jury returns a special verdict and the court upholds at least one specification of negligence, any error regarding the other specifications does not require reversal).

## C.  *Lost profits*

We next address Amerititle's challenge to the trial court's denial of its motion for directed verdict on Peterson's request for "lost profits." Specifically, Amerititle maintains that Peterson's request for lost profits fails as a matter of law because his evidence relating to his budget and expected sale price of the house was "purely speculative."

A party seeking to recover lost profits must establish with "reasonable certainty" the "existence and amount of [lost] profits[.]" *Pearson v. Schmitt*, 259 Or 439, 442, 487 P2d 84 (1971). "Reasonable certainty" is not a demanding standard—"reasonable probability is all that is required." *City of Eugene v. Monaco*, 171 Or App 681, 688, 17 P3d 544 (2000). The question of whether claimed damages were proven is a question of fact for the jury. *Tadsen v. Praegitzer Industries, Inc.*, 324 Or 465, 472, 928 P2d 980 (1996). Accordingly, when reviewing the trial court's refusal to withdraw the issue of lost profits from the finder of fact, "the question is whether there was evidence in the record to permit a finding of *some* net lost profits." *GPL Treatment, Ltd. v. Louisiana-Pacific Corp.*, 133 Or App 633, 637, 894 P2d 470 (1995), *aff'd*, 323 Or 116, 914 P2d 682 (1996). The reasonable certainty standard is intended "to screen out an issue from the jury when the court has concluded that the evidence, taken as a whole, is

---

descriptions used in real estate closing documents are correct and subjecting them to negligence liability for any errors. We disagree; this case, like *Ivy* and *Lindstrand*, involved an escrow company acting, despite no obligation to do so, outside the scope of its duty as a neutral stakeholder.

clearly insufficient to establish the fact sought to be proved." *Welch v. U. S. Bancorp*, 286 Or 673, 704, 596 P2d 947 (1979).

Amerititle, on appeal, focuses on Peterson's evidence of his potential construction costs for the home that he intended to sell at a profit. It maintains that Peterson's only evidence of the costs that he would incur toward that projected profit was his testimony regarding his budget, which consisted only of a projection of what he "hoped to spend." Amerititle asserts that that testimony, without more, is too speculative as a matter of law to support an award of lost profits. In particular, Amerititle points out that Peterson had little to no prior experience in home construction, and it claims that a "rough" budget from such an unqualified person is pure speculation.

The evidence at trial as to Peterson's anticipated building costs, though limited, is not clearly insufficient to establish the existence and extent of lost profits. Peterson testified:

> "* * * We went through, you know, all the materials and all the costs and we had originally figured about 250[,000], so we were, you know 250[,000] to 300[,000]. We were figuring 300[,000] maximum.
>
> "* * * * *
>
> "We were going to do a lot of the work ourselves so we were going to do all the finish work, put in all the—any tile or slab counters. We were going to put in the kitchen, the flooring."

On cross-examination, Peterson further explained that his budget included an estimate of approximately $35,000 that he received for electrical work and framing and that he met with the general contractor and determined that, based on materials and costs, the house would cost a maximum of $300,000 to build (including land costs). He noted that he had minimal experience in construction—consisting of some framing work that he had done for a cousin many years before—but that he relied heavily on the general contractor's expertise, as well as bids for framing and electrical work in developing the budget.

Given that proof of damages is generally a question of fact and that the "reasonable certainty" standard is focused on whether there is evidence in the record to support a finding of *some* lost profits, we cannot say that the evidence, taken as a whole, is clearly insufficient to establish the existence of the building costs that Peterson described in his testimony. His budget was based in part on the estimate that he received, as well as the advice of his contractor. The jury was free to take into account the limits of his expertise and construction experience, and, in fact, the jury did not award him the full amount of the lost profits that he sought.

## II. THE CROSS-APPEAL

We now turn to Peterson's cross-appeal. We affirm the judgment as to Peterson's claims for breach of contract and breach of fiduciary duty without further discussion and write to address the remaining claim for misrepresentation, reversing the judgment for Amerititle with respect to that claim.

Peterson, in his first assignment of error on cross-appeal, contends that the court erred in granting summary judgment on his misrepresentation claim. Summary judgment is appropriate if no objectively reasonable jury could reach a verdict for the nonmoving party on the subject of the motion based on the evidence in the record, viewed in the light most favorable to the nonmoving party. ORCP 47 C. The nonmoving party has the "burden of offering admissible evidence to create a genuine issue of material fact 'on any issue raised in the motion as to which the adverse party would have the burden of persuasion at trial.' " *O'Dee v. Tri-County Metropolitan Trans. Dist.*, 212 Or App 456, 463, 157 P3d 1272 (2007).

To prevail on a fraud claim, a plaintiff must show by clear and convincing evidence

" '(1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted on by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; (9) and his consequent and proximate injury.' "

*OPERB v. Simat, Helliesen & Eichner*, 191 Or App 408, 424, 83 P3d 350 (2004) (quoting *Conzelmann v. N.W.P. & D. Prod. Co.*, 190 Or 332, 350, 225 P2d 757 (1950)).

Peterson's misrepresentation claim was based, in part, on the theory that Amerititle represented to him, orally and in writing, that the escrow instructions, preliminary title report, title insurance policy, and documents of conveyance were for the lot that he intended to buy when, in fact, they were for a different lot. His claim references two specific representations by Amerititle. First, Peterson testified that the escrow officer called him on the day of closing and told him that she would be faxing him closing papers on "the lot." Similarly, the fax cover sheet from Amerititle to Peterson noted that the "closing papers on the purchase of the Lot from Wasco County" were enclosed. From those statements, Peterson alleged that Amerititle represented that it was sending him the documents necessary to close the transaction on Lot 8, Phase I—the lot for which he had signed the original earnest money agreement. In addition, Peterson alleged that Amerititle's failure to disclose that it had changed the description on the property in the earnest money agreement was also a misrepresentation amounting to fraud.

The trial court granted summary judgment based on its conclusion that Peterson did not rely on any representation by Amerititle and that, even if he did, his reliance was unreasonable because he signed the closing documents without reading them. Peterson contends that he did in fact rely on Amerititle's representations in that he signed the closing documents, at least in part, because he understood Amerititle's communications to mean that the closing documents were for Lot 8, Phase I. Further, he contends that it was for the jury to decide whether his reliance was reasonable. Amerititle responds that Peterson did not present any evidence that he relied on any alleged misrepresentation of Amerititle because Peterson acknowledged that he did not read any of the closing documents.

Initially, we conclude that the trial court erred to the extent that it granted summary judgment based on a determination that Peterson did not rely on the alleged misrepresentations. The evidence, viewed in the light most favorable

to Peterson, demonstrated that Peterson signed the closing documents based on his belief that he was purchasing Lot 8, Phase I, and that that belief was, at least in part, a direct result of Amerititle's oral and written representations that the closing documents were for "the lot" that he had agreed to purchase in the earnest money agreement. "Direct evidence of reliance in support of a fraud claim is not required; a plaintiff may prevail on a showing that a reasonable inference of reliance can be drawn from the facts in evidence." *Wieber v. FedEx Ground Package System, Inc.*, 231 Or App 469, 482, 220 P3d 68 (2009). In sum, whether Peterson read the closing documents does not alter the fact that he relied on the alleged misrepresentations about what they contained.

The question remains, however, whether Peterson reasonably relied on the alleged misrepresentations when the closing documents explicitly referenced only Lot 8, 1st Addition. The trial court essentially concluded that it was unreasonable as a matter of law for Peterson to rely on Amerititle's alleged misrepresentations without actually reading the closing documents to confirm that he was indeed purchasing Lot 8, Phase I.

As an initial matter, whether reliance is reasonable requires examination of the totality of the circumstances, including the sophistication of the party asserting fraud. *Vasquez-Lopez v. Beneficial Oregon, Inc.*, 210 Or App 553, 580, 152 P3d 940 (2007). As we have explained,

> "[R]easonableness is measured in the totality of the parties' circumstances and conduct. For example, if there is a naive and unsophisticated plaintiff on one side of the equation and an unscrupulous defendant * * * on the other, a court might well conclude that, although a more sophisticated party would not have taken at face value the false representations of the defendant, *that* particular plaintiff was justified in doing so."

*OPERB*, 191 Or App at 428 (emphasis in original). Moreover, whether reliance is reasonable is generally a question of fact. *Id.* at 425 n 14. Our inquiry on review of summary judgment, therefore, is whether it was unreasonable as a matter of law for Peterson to rely on the statements of Amerititle without

independently investigating the closing documents to determine if they actually conveyed Lot 8, Phase I.

Under our standard of review, viewing the evidence and all inferences in favor of Peterson, we cannot say as a matter of law that it was unreasonable for Peterson to rely on alleged misrepresentations of Amerititle—particularly given that the change in the property description was small and Peterson was given no explicit notice of any change. Rather, it is for the finder of fact to consider the totality of the circumstances and make that decision. Accordingly, we reverse the judgment for Amerititle on the misrepresentation claim.

Affirmed on Amerititle's appeal. On Peterson's cross-appeal, reversed and remanded on misrepresentation claim; otherwise affirmed.