Argued and submitted December 20, 2018; reversed and remanded as to intentional interference claim, otherwise affirmed April 8, 2020

SUMMA REAL ESTATE GROUP, INC.,
an Oregon corporation; and
Eric Martinez, an individual,
*Plaintiffs-Respondents,*

*v.*

Tim HORST,
an individual;
Summit Group Realtors, Inc.,
an Oregon corporation;
Summa Holdings, LLC,
an Oregon limited liability company; and
Boss Real Estate Solutions, LLC,
an Oregon limited liability company,
*Defendants,*

*and*

Paul KNIGHTON,
an individual,
*Defendant-Appellant.*

Multnomah County Circuit Court
121013257; A161221

464 P3d 483

This is a civil lawsuit related to the diversion of funds from one company to another. The only claim relevant on appeal is plaintiff's claim for intentional interference with contract, economic relations, and prospective business advantage (IIER). Following a bench trial, the trial court entered judgment in plaintiff's favor and against defendants on the IIER claim, awarding lost profits as damages. The trial court expressly stated that it was treating the diverted gross revenues as net lost profits because defendants had failed to prove expenses. On appeal, defendant argues that the trial court erred in denying his motion for directed verdict, because plaintiff offered insufficient evidence to establish any type of damages on the IIER claim. Alternatively, defendant assigns error to the specific damages awarded after trial—that is, lost profits—because it was plaintiff's burden to establish expenses, so that the court could calculate net lost profits, and plaintiff failed to do so. *Held*: The trial court did not err in denying the directed verdict motion, but it did err in awarding lost profits as damages on the IIER claim. The trial court improperly shifted the burden to defendants when it used gross revenues to calculate net lost profits due to defendants' failure to prove expenses.

Reversed and remanded as to intentional interference claim; otherwise affirmed.

Karin Johana Immergut, Judge.

J. Kevin Shuba argued the cause for appellant. Also on the brief were Shayna M. Rogers and Garrett Hemann Robertson P.C.

Christopher J. Kemper waived appearance for respondents.

Before DeHoog, Presiding Judge, and Egan, Chief Judge, and Aoyagi, Judge.*

AOYAGI, J.

Reversed and remanded as to intentional interference claim; otherwise affirmed.

_____

*	Egan, C. J., *vice* Hadlock, J. pro tempore.

## AOYAGI, J.

This appeal relates to a civil lawsuit between plaintiffs Eric Martinez (Martinez) and Summa Real Estate Group, Inc. (Summa Group) and defendants Tim Horst (Horst), Paul Knighton (Knighton), Summa Holdings, LLC (Summa Holdings), Boss Real Estate Solutions, LLC (Boss), and Summit Group Realtors, Inc. (Summit Realtors). The parties brought various claims against each other, only one of which is relevant on appeal: plaintiffs' claim against all defendants for intentional interference with contract, economic relations, and prospective business advantage (IIER).

Following a bench trial, the trial court entered judgment in Martinez's favor on the IIER claim, awarding $97,305 in lost profits as damages, with all defendants jointly and severally liable.[1] Knighton appeals, raising three assignments of error. First, he contends that the trial court erred in denying his motion for directed verdict on the IIER claim. Second, he challenges the trial court's damages award on the IIER claim. Third, he contends that the trial court erred in denying his ORCP 71 motion. For the reasons that follow, we conclude that the trial court did not err in denying the directed verdict motion, but that it did err in relying on lost gross revenues to award lost profits, and we do not reach the third assignment of error.

### FACTS

Except as otherwise noted, we state the historical facts consistently with the trial court's findings. We also include undisputed procedural facts from the record.

In 2009, Martinez and Horst partnered to create a real estate business concept. Martinez and Horst formed two companies—Summa Group and Summit Realtors—in which they each had 50 percent ownership. There was no official documentation, but Summa Group effectively served as a franchisor. Affiliated offices could use the Summa Group name and logo, in exchange for paying certain fees,

---

[1] Because the claims were pleaded and tried on behalf of both plaintiffs, we generally refer to "plaintiffs" when discussing the record. However, the trial court ultimately entered judgment only for Martinez, so we refer only to Martinez when necessary to keep that point clear.

and real estate agents could participate in Summa Group's passive income program, which provided rewards for recruiting more real estate agents to the Summa brand. Summa Group eventually had about eight independently owned but affiliated offices. Summit Realtors, owned by Martinez and Horst, was also an affiliated office.

In 2011, Knighton left his job as a general manager for another real estate company and started working with Summa Group.[2]

In early 2012, Horst and Martinez's relationship began to deteriorate. Martinez gave up his ownership interest in Summit Realtors. Martinez retained his ownership interest in Summa Group, however, and refused to let Knighton become an equity partner in Summa Group. Without Martinez's knowledge, Horst began diverting funds from Summa Group to Summa Holdings—a separate entity owned by Horst and Knighton—to the point that Summa Holdings effectively took over Summa Group's business.

In late 2012, Martinez and Summa Group filed this action. In the operative complaint, they asserted five claims against defendants, including, as relevant here, a shareholder oppression claim against Horst, a breach of fiduciary duty claim against Horst, and an IIER claim against all defendants (that is, Horst, Knighton, and the three entities owned by Horst and Knighton). Knighton asserted various counterclaims against plaintiffs, including unjust enrichment.

All claims were tried to the court, but we limit our discussion to the IIER claim, specifically the damages element of that claim.[3] In the complaint, plaintiffs sought $500,000 in unspecified economic damages on the IIER

---

[2] In 2011, Horst and Knighton formed Boss. Boss is one of the defendants in this action, but the facts about Boss are not relevant to this appeal.

[3] The elements of an IIER claim are: "(1) the existence of a professional or business relationship ***, (2) intentional interference with that relationship, (3) by a third party, (4) accomplished through improper means or for an improper purpose, (5) a causal effect between the interference and damage to the economic relationship, and (6) damages." *Porter v. Oba, Inc.*, 180 Or App 207, 213, 42 P3d 931, *rev den*, 334 Or 693 (2002). Only the damages element is at issue in this appeal.

claim. At trial, they presented evidence in support of various damages theories. At the close of plaintiffs' case, and at the close of all evidence, defendants moved for a directed verdict, arguing that the evidence was insufficient to establish any damages on the IIER claim. The trial court expressly denied the initial motion and implicitly denied the renewed motion.

Two months after trial, the parties appeared before the trial court to hear its verdict and findings. The court began by asking several questions, one of which pertained to damages on the IIER claim. The court inquired "how much" plaintiffs were "asking for" on that claim. Plaintiffs responded that they were not requesting a specific amount, because it was "really an ongoing damage" and therefore "hard for [plaintiffs] to give a number." When pressed by the court for a specific number, plaintiffs pointed to $13,326 in checks that Horst had written from Summa Group's bank accounts to himself, Knighton, Summit Realtors, and Summa Holdings, which plaintiffs challenged as improper transfers. Plaintiffs also pointed to $102,696 that Martinez claimed to have loaned to Summa Group in 2009 and 2010 that could not be repaid due to defendants' diversion of funds. Plaintiffs agreed that they were "not asking for a specific amount" beyond those figures.

When it finished asking questions, the trial court announced its verdict and stated its findings. The court found in Martinez's favor on the shareholder oppression, breach of fiduciary duty, and IIER claims, and it found in Knighton's favor on the unjust enrichment counterclaim. The court dismissed all other claims. As part of its resolution of the shareholder oppression claim, the court ruled that Summa Group would be dissolved.

With respect to damages on the IIER claim, the only damages that the trial court awarded were lost profits. The court awarded $97,305 to Martinez against all defendants jointly and severally, explaining that the amount was based on Exhibit 17, a Summa Holdings profit and loss (P&L) statement that plaintiffs had introduced into evidence. According to the P&L statement, in 2012—a year in which defendants diverted income from Summa Group to Summa Holdings— Summa Holdings had "total income" of $194,609.82 and

"total expenses" of $216,414.68, resulting in "net income" of *negative* $21,804.86. The court explained that it had calculated Martinez's lost profits by taking Summa Holdings' "total income" for 2012 ($194,609.82), rounding up to the nearest dollar ($194,610.00), and dividing by two (to reflect Martinez's 50% ownership of Summa Group).

As for why it was using Summa Holdings' gross revenues and not making any deduction for expenses, the court explained:

> "[T]hat is the revenue that was presented in Exhibit 17. And I find that those are actually the profits. I don't consider the losses there. Even though that would be gross revenues, I also find that that is net, because the expenses taken out of that were not approved by Mr. Martinez. \*\*\* *And I didn't find that defendants were able to justify the expenses taken out of that.* \*\*\* And that is the only concrete number that I was provided with respect to what profits were lost to Mr. Martinez as a result of the actions of Mr. Horst."

(Emphasis added.)

The court later reiterated the same point about gross revenues versus net profits, stating specifically in connection with the IIER claim that "the only concrete, nonspeculative amount are profits [by which, in context, the court meant revenues], because the expenses *were not proven by the defense satisfactorily* and they were not agreed to by Mr. Martinez." (Emphasis added.) Similarly, it stated again toward the end of the hearing:

> "Yeah, so there basically was not sufficient evidence *presented by the defense that was credible to support what went out*, which is why I just looked at the amount coming in for purposes—and then didn't speculate as to future revenue as [plaintiffs' counsel] would suggest that I do, because I felt that was mere speculation. But I don't think there was sufficient evidence *presented by the defense that I found credible to show that the amounts going out were substantiated and approved*. So that's how I came [up] with the best number I could find of the $194,609.82."

(Emphases added.)[4]

---

[4] Very little evidence was presented at trial regarding the expenses listed on Exhibit 17. During Knighton's testimony, plaintiffs' counsel asked him about five of the eighteen expense lines on the P&L statement, and Knighton responded

Entry of judgment was delayed for over a year while the parties obtained an appraisal of Summa Group in connection with its court-ordered dissolution and the resulting buyout of Martinez. During that period, the court referenced its trial findings several times in hearings related to the dissolution, including recollecting that it had not deducted expenses when calculating lost-profits damages on plaintiffs' claims because the court "did not feel that, during the trial, [the] defense had sufficiently established the legitimacy of those expenses." When defendants continued to challenge the lost profits damages, including specifically challenging the reliance on Summa Holdings' gross revenues instead of net profits, the trial court stated that it would "stick with" its $97,305 award and reasoning.

The trial court eventually entered a general judgment consistent with its trial findings, which Knighton now appeals. We note that Knighton is the only party who filed a substantive brief on appeal. None of the other defendants have pursued an appeal,[5] and plaintiffs declined to file an answering brief on the merits because, after Knighton filed his notice of appeal, plaintiffs assigned their interest in the general judgment to a limited liability company owned by Horst.

## ANALYSIS

In his first assignment of error, Knighton argues that the trial court erred in denying his motion for directed verdict on the IIER claim. We review the denial of a motion for directed verdict for legal error. *Miller v. Columbia County*, 282 Or App 348, 349, 385 P3d 1214 (2016), *rev den*, 361 Or 238 (2017). A directed verdict is to be granted only when the evidence, viewed in the light most favorable to the

very generally, saying that he would need to see the more detailed accounting in the company's ledger to answer specifically. The ledger was not introduced into evidence by either party, and Knighton was not asked any further questions about Exhibit 17. Nor did anyone else testify about the expenses listed on Exhibit 17.

[5] Horst and Summit Realtors filed a notice of appeal, but the appeal was ultimately dismissed at their request. Shortly before the dismissal, Horst and Summit Realtors filed a "response brief" in which they sought to join in Knighton's first and second assignments of error but contest his third assignment of error. That brief was stricken as part of the court's order dismissing the case as to Horst and Summit Realtors.

nonmoving party, is insufficient to allow a factfinder to find the facts necessary to establish each element of the claim at issue. *Id.*

Plaintiffs' evidence regarding the damages element of the IIER claim was not so wanting as to entitle Knighton to judgment as a matter of law on that claim. As previously noted, plaintiffs presented several different damages theories at trial. In denying a directed verdict, the trial court focused on disputed evidence regarding $102,696 that Martinez had put into Summa Group. Martinez contended that the money was a loan that Summa Group could not repay due to defendants' diversion of funds, while defendants asserted that it was an investment not susceptible to inclusion in a damages award. We agree with the trial court that that factual dispute was sufficient for the IIER claim to survive the directed verdict motion. Because there was at least one damages theory on which there was a disputed factual issue for the factfinder to decide, the trial court did not err in denying the motion for directed verdict.

In his second assignment of error, Knighton raises a different issue, regarding the actual damages that the trial court awarded on the IIER claim. Recall that, sitting as factfinder, the only damages that the trial court awarded on the IIER claim were lost profits. The trial court expressly or implicitly rejected all other damages theories related to the IIER claim, including finding that the $102,696 was an investment, not a loan. Knighton argues that the trial court erred in awarding $93,705 in lost profits to Martinez on the IIER claim. In particular, he argues that the court erroneously based the award on Summa Holdings' gross revenues for 2012, instead of its net profits, and in the process failed to hold plaintiffs to their burden of proving Summa Group's lost profits with reasonable certainty.

The party seeking to recover lost profits bears the burden to prove them. *Peterson v. McCavic*, 249 Or App 343, 354, 277 P3d 572, *rev den*, 352 Or 564 (2012). Specifically, the party "must establish with reasonable certainty the existence and amount of lost profits." *Id.* (internal quotation marks and brackets omitted); *see also, e.g., Willamette Quarries v. Wodtli*, 93 Or App 306, 309-10, 761 P2d 1356

(1988), *aff'd*, 308 Or 406 (1989) ("In an action for lost profits, a plaintiff must prove with reasonable certainty that profits were lost and that the loss was a result of the breach." (Internal quotation marks omitted.)). Importantly, the evidence must "refer[] unambiguously to *net* profits, because only net lost profit may be recovered." *Cruz Development, Inc. v. Yamalova*, 174 Or App 494, 498, 26 P3d 174 (2001) (internal quotation marks, internal citation, and brackets omitted; emphasis added). Reasonable certainty is "not a demanding standard," in that it requires only "reasonable probability," not "absolute certainty." *City of Eugene v. Monaco*, 171 Or App 681, 688, 17 P3d 544 (2000), *rev den*, 332 Or 240 (2001). However, there must be "evidence in the record to permit a finding of some net lost profits" to support an award of lost profits. *Cruz Development*, 174 Or App at 498 (internal quotation marks and emphasis omitted).

We agree with Knighton that the trial court erred in awarding lost profits to Martinez on this record. In treating Summa Holdings' gross revenues as Summa Group's lost profits, because *defendants* failed to prove the amount and "legitimacy" of Summa Holdings' expenses so as to "justify the expenses," the trial court improperly shifted the burden of proving net lost profits to defendants.[6]

Our decision in *Cruz Development* is instructive. There, the defendant purchased real property from the plaintiff for the purpose of building rental units. 174 Or App at 496. The defendant incurred significant unexpected expenses and lost rental income due to a delay in constructing the units. *Id*. In subsequent litigation, the defendant asserted counterclaims for misrepresentation against the plaintiff, seeking damages for the unexpected costs she incurred and for the lost profits caused by the delay. *Id*. at 496-97. With respect to lost profits, the defendant testified at trial that she had lost $15,900 of rental income due to the

---

[6] In ruling on lost profits, the trial court also noted that Martinez had not "approved" any of Summa Holdings' expenses, but that point is not in dispute. The entire basis for the IIER claim (and plaintiffs' other claims) was that defendants had diverted funds from Summa Group to Summa Holdings without Martinez's knowledge or approval. The fact that Martinez did not approve anything related to the diversion is what gave rise to the claim, but it did not excuse Martinez from proving his damages.

delay, which testimony she corroborated with rental agreements. *Id.* at 497. A jury found in the defendant's favor on her counterclaims and awarded her damages. *Id.*

On appeal, the plaintiff asserted that the trial court had erred in submitting the lost profits claim to the jury because the defendant had "failed to submit any evidence of net profits." *Id.* at 497-98. The plaintiff did "not argue that defendant failed to establish that she suffered any loss of profits as a result of plaintiff's misrepresentations" but, rather, "that defendant failed to present any evidence of the amount of her lost *net* profits." *Id.* at 498 (emphasis in original). We agreed with the plaintiff that the trial court had erred. *Id.* at 499. Specifically, although the defendant had proved her lost revenue, she had not proved her lost *profits*, because she had not submitted evidence of the expenses that she would have incurred to earn that revenue. *Id.* Moreover, the defendant's own evidence showed that she anticipated having expenses, because the rental agreements imposed certain maintenance and repair obligations on her. *Id.* Because the defendant could only recover her *net* lost profits, and because the jury would have to engage in pure speculation to calculate the defendant's *net* lost profits, the trial court erred in allowing the issue of lost profits to go to the jury. *Id.*

In this case, similarly, the trial court erred in awarding lost profits to Martinez, where the only evidence regarding expenses was the evidence in Exhibit 17, showing that Summa Holdings' expenses exceeded its revenues. Knighton does not dispute that the trial court could treat Summa Holdings' total income in 2012—that is, the $194,609.82 shown on Summa Holdings' P&L statement (Exhibit 17)—as gross revenues that defendants diverted from Summa Group to Summa Holdings. However, when a party seeks to recover lost profits, it must prove *net* lost profits. *Id.* at 498. Here, the trial court rejected the only evidence of expenses on the basis that *defendants* had failed to persuade the court that those expenses were legitimate.

The problem with that approach is that proving lost profits is not a burden-shifting exercise. It is not a situation in which the plaintiff has the burden to establish lost gross

revenues, and then the defendant has the burden to establish the related expenses, so as to allow the factfinder to calculate net profits. Rather, the burden of proving lost profits, *i.e.*, *net* lost profits, is entirely on the plaintiff. If plaintiffs were skeptical of the $216,414.68 in expenses shown on Exhibit 17, they were free to put on evidence that Summa Group would have incurred fewer expenses to obtain the $194,609.82 of gross revenues. But plaintiffs did not offer any evidence as to the amount of expenses that Summa Group would have incurred to obtain those revenues. Moreover, Summa Group's own P&L statements for 2009 to 2011, which were also in evidence, showed that Summa Group had historically incurred expenses (sometimes in excess of revenues) to operate its business. In declining to deduct expenses, the trial court made clear that it was doing so because it lacked sufficient evidence to determine which expenses were legitimate, not based on an implicit finding that there would have been no expenses.

Given the burden of proof, once the trial court determined that there was insufficient evidence to determine the amount of expenses (such that it would have to engage in speculation), the court should have concluded that *plaintiffs* had failed to prove lost profits with reasonable certainty, not treated Summa Holdings' gross revenues as Summa Group's net profits based on *defendants*' failure to prove which expenses were legitimate. Because plaintiffs did not offer evidence sufficient to establish *net* lost profits with reasonable certainty, the trial court erred in awarding Martinez lost profits as damages on the IIER claim.[7]

We therefore reverse and remand for entry of a new judgment consistent with this opinion. In doing so, we emphasize that the IIER claim is the only claim at issue on appeal. The trial court also awarded lost profits (calculated in the same manner) on Martinez's shareholder oppression and breach of fiduciary duty claims, but no one has

_____

[7] This case comes to us in a somewhat unusual posture, because of the way in which plaintiffs' various damages theories were presented, tried, and ultimately resolved. However, on this record, we conclude that defendants' challenges to the lost profits damages theory and award were sufficient to preserve the claim of error.

challenged those awards, and our decision on appeal has no effect on those awards.[8]

Reversed and remanded as to the intentional interference claim; otherwise affirmed.

---

[8] Given our disposition, we do not reach the third assignment of error, which challenges the trial court's denial of an ORCP 71 motion that Knighton filed after plaintiffs assigned their interest in the general judgment to a company owned by Horst. The third assignment is presented as an "alternative" to the other assignments of error.