No. 36     January 24, 2024     273

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

Richard WEINER,
individually and
dba Sunnyview Labradors and
Brad Barcroft, individually and
dba Driftcreek Labradors,
*Plaintiffs-Respondents,*

*v.*

INTERNATIONAL ANIMAL SEMEN BANK, LLC,
*Defendant-Appellant,*

*and*

Carrol PLATZ,
individually and
dba International Animal Semen Bank, LLC,
*Defendants.*

Clackamas County Circuit Court
17CV10328; A174441

Heather Karabeika, Judge.

Submitted November 18, 2021.

Nicholas O. Herman argued the cause for appellant. Also on the briefs was Lower Columbia Law Group LLC.

Geordie Duckler argued the cause for respondents. Also on the brief was Geordie Duckler, P. C.

Before Shorr, Presiding Judge, Lagesen, Chief Judge, and Powers, Judge.*

POWERS, J.

Reversed and remanded.

_____

\* Lagesen, C. J., *vice* Sercombe, S. J.

**POWERS, J.**

Defendant International Animal Semen Bank (IASB), who was in the business of collecting, storing, and maintaining canine semen for breeders, appeals from a general judgment issued after a jury awarded plaintiffs Richard Weiner and Brad Barcroft a total of $400,000 in lost profits as economic damages. On appeal, defendant contends that the trial court erred in denying its motion for directed verdict because plaintiffs did not present legally sufficient evidence for the jury to consider lost profits. For the reasons described below, we agree with defendant's argument and reverse and remand.

We review the trial court's denial of defendant's motion for directed verdict for legal error. *Miller v. Columbia County*, 282 Or App 348, 349, 385 P3d 1114 (2016), *rev den*, 361 Or 238 (2017). A court should grant a directed verdict only when the evidence is insufficient to allow a factfinder to find the facts necessary to establish each element of the claim at issue. *Id*. In reviewing the denial of a motion for a directed verdict, we consider the evidence in the light most favorable to the nonmoving party—as well as all reasonable inferences that may be drawn from that evidence—to determine if the moving party was entitled to prevail as a matter of law. *See Ballard v. City of Albany*, 221 Or App 630, 639, 191 P3d 679 (2008) (outlining standard of review and explaining that the court cannot weigh conflicting evidence or evaluate credibility). We describe the facts below in accordance with that standard.

Plaintiffs Weiner and Barcroft, who are professional dog breeders specializing in hunting and field dogs, collect and sell semen from studs as part of their business. Plaintiffs hired defendant to maintain dog semen in frozen vials and store them in a facility to preserve the condition of the semen for future use. After defendant informed plaintiffs that it was closing their accounts, plaintiffs agreed to have the vials stored in a different facility and had the semen independently tested by another company to ensure that it was in the same condition as when it was initially collected from the dogs. Following those tests, plaintiffs filed this action alleging that the semen stored by defendant had

dropped in quality, and several vials were unaccounted for after an inventory count.

Plaintiffs' claims against defendant were for breach of bailment and negligence.[1] As part of those claims, Weiner sought $500,000 in general, unspecified economic damages, and Barcroft sought $300,000 for the same.[2] At trial, plaintiffs testified about their economic loss resulting from defendant's actions and each introduced one exhibit to show how they arrived at their requested amount.

Weiner testified that he sold puppies bred from his stud dogs for about $2,500 or $3,000 each. Weiner also testified that he sold vials of semen for about $3,000 each and that it takes two vials to impregnate a dog. Weiner later testified that, after "amortiz[ing] the cost of collection, freezing, storage, everything, plus the value of the semen from the stud dog that it's grown from *** [t]he bill is roughly $2,500 just to inseminate" a dog.

Plaintiffs also introduced Exhibit 79, which was titled "Sunnyview Financial Impact Calculation," in support of Weiner's request for economic damages. Exhibit 79 describes $2,516 as the "[average] [c]ost [p]er [p]uppy," noting that each breeding produces about eight puppies and that Weiner had five litters to breed, which totaled $100,624 in "lost litter revenue." The exhibit also shows that Weiner had 144 vials in storage with defendant that he planned to sell for $3,000 each and that he suffered $432,000 in "lost semen sales revenue." Together, the exhibit shows a "calculated [t]otal loss" of $532,624, which Weiner rounded down to arrive at his prayer of $500,000. After the table showing the number of puppies from each breeding, the exhibit ends with a "clarifications" section that explains: "This is [the]

---

[1] Plaintiffs also sued defendant for negligent misrepresentation, fraudulent misrepresentation, and for violations of the Oregon Unlawful Trade Practices Act. Those claims are not before us, however, because the trial court later dismissed those claims and only the breach of bailment and negligence claims proceeded to the jury. Further, the operative complaint also named Carrol Platz, who was an employee of IASB, as a codefendant. The trial court dismissed all claims as to Platz, and he is not a party to this appeal.

[2] Damages are required elements for a plaintiff to recover for breach of bailment and negligence. *Barnes v. Lackner*, 93 Or App 439, 442, 762 P2d 1043 (1988) (breach of bailment); *Sloan v. Providence Health Sys.-Oregon*, 364 Or 635, 643, 437 P3d 1097 (2019) (negligence).

cost of the puppy only. Does not include" additional costs for veterinarian services, microchipping, feed, crate, advertising, semen storage, insemination, and "any other cost of operation."

For his part, Barcroft testified that, when this lawsuit started, he sold puppies for $1,500 each, and that he increased his prices by the time of trial to $2,000 per puppy. Barcroft explained that most breeding sessions produced about eight puppies and that his recordkeeping was done "all together" in that he tracked "gross sales [and] gross expenses."

Plaintiffs introduced Exhibit 50.5, titled "Semen Storage Tracking Sheet," in support of Barcroft's damages. That exhibit contains a section for "[p]rojected [f]inancial [i]mpact due to loss of semen viability," which shows that Barcroft was unable to perform 13 breedings, which would have had eight puppies per litter minimum, for a total of 104 puppies that he was unable breed. The exhibit also lists a $2,500 sale price for each puppy—a higher amount than Barcroft testified to—and arrives at a total financial impact of $301,600 from the damaged and lost vials. Barcroft testified that he arrived at his $300,000 damage request by taking the number of vials that he had stored with defendant and multiplying the number of vials by the average eight puppies per breeding to get the total number of lost puppies. He then took the total number of lost puppies and multiplied that by a $2,500 "validated" sales price, which created a subtotal of $260,000. He then adjusted that subtotal to account for the "[f]uture rise in pricing that would happen over time as the semen would not have degraded" to arrive at a total request of $300,000 in damages.

On the third day of trial, after plaintiffs rested their case, the trial court heard argument on defendant's written motion for a directed verdict on all of plaintiffs' claims. In that motion, defendant argued that, because both plaintiffs presented insufficient evidence for the jury to calculate lost profits as damages without engaging in speculation, the trial court should enter a directed verdict or withdraw the issue of lost profits from the jury's consideration. Plaintiffs did not file a written response. Plaintiffs' counsel explained

that he was just handed the motion in the morning, and he further declined the trial court's offer to take a recess to review it. Plaintiffs argued that the trial court should deny the motion:

> "[T]here was testimony about the cost of the dog. There was testimony about the cost of a vial. There was testimony that the vials were lost and that the Plaintiffs sold dogs and sold semen, and without the semen and without the dogs, they lost money. That's all the elements you need in terms of a directed verdict.

> "I don't—and obviously, we'll get to this again, and the Court knows this. But [defendant's] standard is [defendant has] to show no evidence. Not weak evidence or insubstantial evidence. But no evidence at all on damages. And I presented through both Plaintiffs plenty of evidence for the jury to make a calculation. Not just speculate. It wasn't just the type of case where the Plaintiff says, I lost a lot of money but I have no way for you to actually know that, I just want the money.

> "This is where actually both Plaintiffs went, took some trouble to explain their business practices and to explain their expenses, and to explain what it is the value of that was lost. So those are lost profits. And they certainly are receivable in any of—under any of the claims. So yes, under a no evidence standard this would be plenty of evidence for damages for both."

The trial court denied the motion for directed verdict and alternative motion to withdraw the lost profits from the jury's consideration, and later the jury returned a verdict finding defendant negligent and in breach of bailment as to both plaintiffs. The jury awarded Weiner $300,000 and Barcroft $100,000 in economic damages. Defendant timely appeals.

On appeal, defendant contends that the trial court erred in denying its motion for a directed verdict or alternative motion to strike the claim for lost profits, arguing that the evidence was legally insufficient for the jury to award lost profits. Defendant asserts that plaintiffs presented a theory of lost revenues, not a theory of lost profits, to the jury and maintains that lost revenues are not legally cognizable damages. *See Cruz Development, Inc. v. Yamalova*, 174 Or App

494, 499, 26 P3d 174 (2001) (explaining that a party seeking lost profits must present evidence that refers "unambiguously to net profits" (internal quotation marks and citation omitted)). Plaintiffs dispute defendant's characterization of their theory for damages by arguing that they did not make a case of lost revenue or lost profits, but rather were seeking generalized economic damages. Plaintiffs further argue that the jury had sufficient evidence to award lost profits.

A party seeking lost profits as damages "'must establish with reasonable certainty the existence and amount of lost profits.'" *Summa Real Estate Group, Inc. v. Horst*, 303 Or App 415, 422, 464 P3d 483 (2020) (quoting *Peterson v. McCavic*, 249 Or App 343, 354, 277 P3d 572, *rev den*, 352 Or 564 (2012)). "Reasonable certainty" is not a demanding standard; it requires "reasonable probability," not "absolute certainty." *City of Eugene v. Monaco*, 171 Or App 681, 688, 171 P3d 544 (2000), *rev den*, 332 Or 240 (2001). The evidence must refer "unambiguously to net profits" because only net lost profits—not lost revenue—may be recovered. *Cruz Development Inc.*, 174 Or App at 498. Importantly, to send the issue of lost profits to the jury, a party must submit evidence of the expenses that the party would have incurred to earn the alleged lost revenue. *See Summa Real Estate Group*, 303 Or App at 424 (noting that the issue of net lost profits requires both evidence of lost revenue and lost expenses incurred to earn that lost revenue).

Thus, the question on appeal when reviewing the trial court's denial of a directed verdict or alternative motion to strike the issue of lost profits is "whether there was evidence in the record to permit a finding of some net lost profits." *Cruz Development, Inc.*, 174 Or App at 498 (emphasis and citation omitted). A plaintiff must present more than speculative or unverifiable estimates of lost profits. *JH Kelly, LLC v. Quality Plus Services, Inc.*, 305 Or App 565, 585, 472 P3d 280 (2020); *see also Verret v. Leagjeld*, 263 Or 112, 115, 501 P2d 780 (1972) (explaining that "the essential ingredient of proof of lost profits to a reasonable certainty is supporting data").

Two cases illustrate those principles. First, in *Cruz Development*, we reversed the trial court's denial of a motion

to strike a party's claim for lost profits and the subsequent jury award because there was insufficient evidence of expenses such that a jury could only calculate lost net profits by engaging in impermissible speculation. 174 Or App at 499. In that case, a homebuilder sold two lots in a subdivision to an individual purchaser who planned to develop duplexes on the lots to rent out as residential properties. *Id*. at 496. The purchaser later stopped making payments on the promissory note after determining that the homebuilder made two misrepresentations about the lots that caused the purchaser to incur unexpected costs and a loss of rental income due to the construction delays caused by the alleged misrepresentations. *Id*. The homebuilder sued the purchaser, and the purchaser counterclaimed and sought damages for the unexpected costs that she incurred and for the loss of rental profits. *Id*. at 496-97. The purchaser testified and submitted exhibits showing that her lost rental revenue totaled $15,900, which was based off her rental income from other properties that she owned and $13,000 in cost overruns. *Id*. at 497. The jury awarded the purchaser lost profits as damages. *Id*.

On appeal, we reversed because the purchaser did not submit evidence of expenses that she would have incurred to earn the rental revenue, even though the purchaser's evidence showed that she anticipated incurring expenses associated with the business of renting and operating her properties. *Id*. at 499. The evidence of lost rental revenue showed only that the purchaser lost income; however, the evidence did not provide a way for the jury to calculate her net lost profits because there was no evidence of expenses to subtract from the income. *Id*. Thus, because the jury could calculate lost net profits only by engaging in "pure speculation," we concluded that the trial court erred in failing to strike the claim for lost profits. *Id*.

Second, in *Summa Real Estate Group*, we concluded that the trial court erred in awarding lost profits when the plaintiffs submitted only one exhibit showing its expenses. There, a soured real estate venture between business affiliates led to a claim for intentional interference with contract, economic relations, and prospective business advantage

(IIER). 303 Or App at 417-18. The case proceeded to a bench trial where the plaintiffs sought $500,000 on their IIER claim. *Id*. at 418-19. The plaintiffs supported their request for damages with a profit and loss statement that contained the business venture's "total income" and "total expenses." *Id*. at 419-20. The trial court denied the defendant's motion for directed verdict on damages for the IIER claim and awarded plaintiffs lost profits. *Id*. at 417, 421. We reversed the lost profits award because the court's award did not deduct expenses from the plaintiff's lost revenue to arrive at a proper calculation of lost profits. *Id*. at 424-25. Thus, the lost profit award did not reflect net lost profits. *Id*. at 424.

        Here, plaintiffs' testimony and exhibits in support of damages did not demonstrate with reasonable certainty the amount of their net lost profits. Specifically, plaintiffs' evidence was ambiguous as to their expenses incurred during their breeding operation, leaving the jury to impermissibly speculate about the amount of net lost profits. *See Cruz Development, Inc.*, 174 Or App at 498. Among the pieces of evidence that plaintiffs point to in support of their claim for lost profits, only Weiner's testimony and Exhibit 79 demonstrates any expenses incurred by either of the parties as legally required to recover lost profits. Weiner testified that the "bill" to inseminate a dog "is roughly $2,500" and Exhibit 79 listed the average cost per puppy as $2,516. In explaining Exhibit 79 at trial, Weiner testified that his "guess" about the "cost per puppy of actually having a puppy" was between $500 and $1,000. As described above, however, Exhibit 79 also included a "Clarifications" section that noted that the listed cost of the puppy did not include various costs, including additional costs for veterinarian services, microchipping, feed, crate, advertising, semen storage, insemination, and "any other cost of operation." Thus, part of the difficulty with plaintiff's reliance on the evidence is that Exhibit 79, which does not take into account the cost of insemination or other costs of the breeding operation, is at odds with Weiner's testimony that "[t]he bill" to inseminate a dog is "roughly $2,500." Even setting that issue aside, however, Weiner's testimony about business expenses is further complicated by his own testimony in which his "guess" at the "cost of actually having a puppy" was between $500

and $1,000. In short, the evidence on the costs of the operation is ambiguous evidence at best, which is insufficient to support the issue of lost profits going to the jury because it would have to speculate to make a factual finding on any lost profits. Moreover, even assuming that Weiner's testimony and Exhibit 79 presented the jury with sufficient evidence of business expenses, Weiner's own calculations for his requested money award impermissibly added the "[l]ost [l]itter [r]evenue" and "[l]ost [s]emen [s]ales [r]evenue." Thus, Weiner's total lost revenue did not take into account any of his expenses to arrive at a net profit loss amount. *See Summa Real Estate Group*, 303 Or App at 424-25 (concluding that the award of lost profit damages was inadequate because it did not deduct expenses from revenue); *see also Buck v. Mueller*, 221 Or 271, 284, 351 P2d 61 (1960) (in computing lost profits, the plaintiff should have deducted the value of his and his wife's labor from the business's income). Accordingly, the trial court erred in denying defendant's motion for directed verdict as to Weiner because there was insufficient evidence to allow the jury to calculate net lost profits without engaging in speculation.

The evidence in support of Barcroft's lost damages is similarly insufficient. Barcroft's testimony dealt with the sales price of puppies, and he further explained that he arrived at his damages request by multiplying the estimated number of puppies that he would have bred if he used the semen vials defendant damaged or lost by the average sales price of $2,500, and then adjusted the amount for inflation. Barcroft presented no evidence of the expenses that he incurred in the breeding process, which the jury needed to calculate net lost profits without engaging in speculation. Accordingly, the trial court also erred in denying defendant's motion for directed verdict as to Barcroft's lost profit damages.

In sum, the trial court erred by denying defendant's motion as to lost profits for both plaintiffs. That error requires reversal because the jury was instructed on loss profits, and there is some likelihood—given the evidence, the instructions as a whole, and the parties' argument—that the jury's award was based in part on a determination

that plaintiffs suffered lost profits. Thus, we remand for a new trial because defendants' entitlement to a directed verdict on lost profits—or withdrawal of the issue of lost profits—does not entitle them to a directed verdict on plaintiffs' claims. Plaintiffs sought economic damages in addition to lost profits—*viz.*, damages for the value of the vials that defendants damaged or lost—and presented some evidence that would allow a factfinder to find in their favor on those damages. Because the jury's verdict does not allocate the damages award between those potentially awarded for lost profits and those potentially awarded for the value of the damaged or lost vials, we must remand for a new trial on the damages to which plaintiff is entitled based on the damage and loss of the vials, excluding damages for lost profits.

For the foregoing reasons, the trial court erred in denying defendant's motion for directed verdict or alternative motion to withdraw the issue of lost profits because there was insufficient evidence for the jury to calculate lost profits, which formed the basis of damages for both the breach of bailment and negligence claims.

Reversed and remanded.