Argued and submitted November 20, 2018, affirmed on appeal and cross-appeal
July 22, 2020

JH KELLY, LLC,
a Washington limited liability company,
*Plaintiff,*

*v.*

QUALITY PLUS SERVICES, INC.,
a Virginia corporation,
*Defendant.*

QUALITY PLUS SERVICES, INC.,
a Virginia corporation,
*Third-Party Plaintiff-Respondent*
*Cross-Appellant,*

*v.*

GEORG FISCHER, LLC,
a Delaware corporation,
*Third-Party Defendant-Appellant*
*Cross-Respondent,*

*and*

PLASTIC SERVICES NORTHWEST, INC.,
an Oregon corporation,
*Third-Party Defendant.*

Washington County Circuit Court
C150321CV; A163205

472 P3d 280

This appeal arises out of litigation resulting from welding work that Quality Plus Services, Inc., a subcontractor, performed as part of a large construction project. Hundreds of pipes that Quality Plus provided needed to be removed and replaced after one of the settings on the machine it used to weld the pipes had been mistakenly recalibrated during a service call. Quality Plus was sued and, in turn, sued the welding machine manufacturer, Georg Fischer, LLC, and the company that performed the service call, Plastic Services Northwest, Inc. A jury returned a verdict in favor of Quality Plus, finding that Georg Fischer and Plastic Services were negligent and allocating fault among the three parties. Georg Fischer appeals the resulting judgment, asserting that the trial court misapplied the economic loss doctrine, agency principles, and the law regarding lost profits and prejudgment interest. Quality Plus cross-appeals, arguing that the trial court erred in directing a verdict against its claim for attorney fees and costs that it incurred defending itself against claims by a settling party. *Held*: On the appeal, the concerns underlying the economic loss doctrine were not implicated,

because the focus of the claimed negligence was physical property that was damaged while in Quality Plus's possession and control—the incorrectly welded pipes; regardless of whether those pipes were owned by Quality Plus or were merely in its control for welding purposes, Quality Plus, as a supplier of fabricated goods, had a relationship to the property such that the property damage could be ascertained, assessed, and paid without producing unfairness or subjecting Georg Fischer to repeated lawsuits for the same property damage. With regard to the question of agency, the evidence permitted a jury to find that Georg Fischer retained control over the manner of performance of the service call program to a degree that was characteristic of the employee-employer relationship, and that Plastic Services was acting as Georg Fischer's agent when it negligently carried out the service call. Quality Plus presented sufficient evidence to submit its claim of lost profits to the jury and was entitled to prejudgment interest on a portion of the damages award. As for the cross-appeal, Quality Plus's standalone claim for attorney fees was not cognizable under Oregon law.

Affirmed on appeal and cross-appeal.


Suzanne Upton, Judge.

Michael T. Stone argued the cause and filed the briefs for appellant-cross-respondent.

Elizabeth D. MacGregor argued the cause and filed the briefs for respondent-cross-appellant. Also on the reply and cross-answering brief were Jeannette L. Moore and Lorber, Greenfield, & Polito, LLP. On the answering and cross-opening brief were Rachel C. Nies and L. Benjamin Allen.

Before Lagesen, Presiding Judge, and DeVore, Judge, and James, Judge.

JAMES, J.

Affirmed on appeal and cross-appeal.

**JAMES, J.**

This appeal arises out of litigation resulting from welding work that Quality Plus Services, Inc., performed as part of a large construction project at Intel. Quality Plus, a subcontractor on the project, had been hired to fabricate piping to be installed on the project. As it turned out, hundreds of those pipes needed to be removed and replaced when it was discovered that one of the settings on the machine used to weld the pipes had been mistakenly recalibrated during a service call, which potentially compromised the welds.

Quality Plus was sued as a result and, in turn, sued the manufacturer of the welding machine, Georg Fischer, LLC, and the company that performed the service call, Plastic Services Northwest, Inc. A jury returned a verdict in favor of Quality Plus, finding that Georg Fischer and Plastic Services were negligent and allocating fault among the three parties. Georg Fischer now appeals the resulting judgment. Generally speaking, its assignments of error assert that the trial court misapplied the economic loss doctrine, agency principles, and the law regarding lost profits and prejudgment interest. Quality Plus cross-appeals, assigning error to the trial court's grant of a directed verdict against its claim for attorney fees and costs that it incurred defending itself against claims by a settling party. As explained below, we affirm on the appeal and cross-appeal.

## I. BACKGROUND

For purposes of background, we begin with an overview of the underlying construction dispute and its procedural history, which we later supplement when discussing particular assignments of error.

During 2013 and 2014, Hoffman Construction served as the general contractor for a large construction project on Intel's campus in Hillsboro. Hoffman hired JH Kelly, LLC, to supply and install process-waste piping on portions of the project. JH Kelly, in turn, contracted with Quality Plus to perform welds on polypropylene and polyvinylidene fluoride piping.

Beginning in December 2013, Quality Plus performed fabrication services in its shop using a Georg Fischer IR-225 fusion welding machine. That machine melts the two faces of the pipes to be fused, and it requires controlled tolerances for the respective distances between the source of the heat and the pipe faces. To ensure those tolerances, the IR-225 machine must be periodically inspected and serviced. After 2,500 fusions or after a period of 18 months in initial service, a message will appear on the machine that alerts the user that it needs to be serviced.

In January 2014, that service message appeared on the welding machine. At that time, Georg Fisher had a "field extension program" in place that allowed users like Quality Plus to extend the number of welds that the machine could perform before it was necessary to send the machine back to Georg Fischer's service center. Under that program, a service technician with "Level II" training from Georg Fischer would first visually inspect the machine, take measurements, and then perform a test weld (called a "coupon") that was sent to Georg Fischer for testing. If the machine and the test weld were in good order, Georg Fischer would approve the field maintenance, called a calibration extension. At that point, a service technician with "Level III" training would use a special key from Georg Fischer (referred to as the +GF+ key) to access the machine's computer system to extend the weld cycle. The technician would then perform another test weld following the completion of the extension, which would then be sent to Georg Fischer.

After the service message appeared on its machine, Quality Plus contacted Plastic Services, a distributor for Georg Fischer, to perform a field extension. On January 14, 2014, Plastic Services sent one of its employees, Brandon Westbrook, to the Quality Plus shop, and he inspected the machine and performed a test weld ("weld 903"). Westbrook, who was a Level II technician, then returned to Plastic Services, where his supervisor, Craig McCormack, sent the appropriate paperwork and test weld to Georg Fischer in California for review. Shortly thereafter, Georg Fischer informed McCormack that the weld was good, and it approved an extension of the weld cycle for another six months and 1,000 welds.

McCormack was certified as a Level III technician and had a +GF+ key from Georg Fisher. However, rather than complete the field extension himself, he gave his +GF+ key to Westbrook and directed him to return to Quality Plus to access the machine's computer system and extend the cycle.

On January 16, Westbrook returned to Quality Plus and used the +GF+ key to change the weld count and the calibration date. However, during the process, Westbrook also unwittingly changed the reference point on the machine from 10.32 to 9.13—a critical difference because of the potential effect on the relative distances between the heat source and pipe faces.[1] Westbrook did not perform a subsequent test weld to send to Georg Fischer.

Quality Plus's welders immediately recognized that the machine was working differently after the work was completed by Westbrook. One of the welders, Joe Odell, had been trained through Georg Fischer to use two fingers of pressure to move a lever during a critical stage of the weld process to "zero out" the machine. After the service work, Odell could no longer zero out the machine using two fingers of pressure. He notified his supervisor, Rod Wilcke, but Wilcke told him that the machine had just been serviced and to continue his welding. From that point, Odell continued to make welds with the machine by using additional pressure at that stage of the process. Other Quality Plus welders had the same problems as Odell, and one of them even tried to adjust the machine by removing some of the shims, but no one from Quality Plus followed up with Plastic Services or Georg Fischer about the way the machine was functioning. The welds made with the IR-225 machine continued to pass visual inspections, and none of the machine's printouts indicated that any of the welds were compromised.

Between January 16, 2014 and July 11, 2014, the extended service date, Quality Plus made more than 900

_____

[1] The reference point for the test weld (weld 903) made by Westbrook on January 14, 2014, before he accessed the machine's menu with the service key, was 10.32, the same value the machine had when it left Georg Fischer's control after being manufactured. It was later discovered that, for the very next weld performed after he accessed the machine (weld 904), the reference point had been 9.13.

welds with the machine in that condition. The machine was then shipped to the Georg Fischer service center, at which point Georg Fischer discovered that the reference point on the machine had been changed. Georg Fischer notified all interested parties that the welds made by Quality Plus with the altered reference point could be defective and should be investigated.

Ultimately, all of those nonconforming welds needed to be replaced, and JH Kelly, Hoffman Mechanical (a subsidiary of Hoffman Construction), and Quality Plus all incurred costs removing and replacing them. Hoffman Mechanical expended approximately $840,000 in labor and materials, and it withheld payment owed to Quality Plus on other parts of the job to recoup that loss. JH Kelly pursued litigation, filing a complaint against Quality Plus seeking $450,000 in damages.

Quality Plus answered and filed a third-party complaint against Plastic Services and Georg Fischer. As relevant to the issues before us, the operative third-party complaint alleged: (1) a claim against Plastic Services and Georg Fischer to recover the attorney fees and costs Quality Plus incurred to defend itself against JH Kelly's claims; (2) a negligence claim against Plastic Services and Georg Fischer; and (3) a breach-of-contract claim against Plastic Services and Georg Fischer.

Quality Plus eventually settled with JH Kelly, and the third-party claims against Plastic Services and Georg Fischer proceeded. At the close of the evidence, the court directed a verdict on Quality Plus's claim for attorney fees, but the negligence and breach-of-contract claims went to the jury, which found in favor of Quality Plus. With regard to negligence, Quality Plus advanced two theories as to Georg Fischer: (1) that Georg Fischer was liable for its own negligence surrounding the field extension; and (2) that Georg Fischer was liable on a vicarious liability theory, because Plastic Services was Georg Fischer's agent and was acting within the scope of authority during the relevant time. On the negligence claim, the jury returned a verdict finding that Plastic Services and Georg Fischer were both at fault in the ways alleged by plaintiff, but that Quality Plus was

also at fault; it assigned 46 percent fault to Plastic Services, 35 percent fault to Georg Fischer, and 19 percent fault to Quality Plus. With regard to damages, the jury returned a verdict of $2,024,715.44.

On the breach-of-contract claim, the jury found that Quality Plus entered into a contract with Plastic Services to perform the field extension, that Plastic Services was acting as Georg Fischer's agent to perform the field extension, and that Plastic Services breached the contract, resulting in $350 in damages.

After the jury's verdict, Quality Plus sought and was awarded post-judgment interest on a portion of the damages awarded for negligence—what the trial court determined to be the "liquidated" part of the jury's damages calculation (the amount paid to JH Kelly and Hoffman Mechanical, and Quality Plus's own expenditures to create replacement welds). The court later entered judgment against Plastic Services and Georg Fisher reflecting the jury's findings on comparative fault and the court's award of prejudgment interest. Georg Fischer now appeals, and Quality Plus cross-appeals.

## II.  ANALYSIS

### A.  *Georg Fischer's Appeal*

On appeal, Georg Fischer advances eight assignments of error. We reject two of those assignments—one involving expert testimony (sixth assignment) and the other involving instructional error (seventh assignment)—without discussion. The rest we address in turn below.

#### 1.  *First assignment: economic loss rule*

In its first assignment of error, Georg Fischer argues that the trial court erred in denying its motion for a directed verdict on Quality Plus's negligence claim under the economic loss doctrine. When reviewing the denial of a motion for a directed verdict, we review the evidence in the light most favorable to the nonmoving party. *Brown v. J. C. Penney Co.*, 297 Or 695, 705, 688 P2d 811 (1984). If, after viewing the facts in that light, the moving party is entitled to judgment as a matter of law, then a directed verdict is

appropriate. But a verdict cannot be set aside "unless we can affirmatively say that there is no evidence from which the jury could have found the facts necessary to establish the elements of plaintiff's cause of action." *Brown*, 297 Or at 705.

The economic loss doctrine is a common-law doctrine created by courts in response to pragmatic concerns over unbounded liability. Fleming James Jr., *Limitations on Liability for Economic Loss Caused by Negligence: A Pragmatic Appraisal*, 25 Vand L Rev 43, 48 (1972). The doctrine exists to resolve potential tension between the broad reach of foreseeability on the one hand, and the scope of human economic activity on the other.

As a general matter, all persons are liable in negligence if their conduct unreasonably creates a foreseeable risk of harm to others. *Slogowski v. Lyness*, 324 Or 436, 441, 927 P2d 587 (1996). Negligence in Oregon extends to the limits of the general principles of foreseeability articulated in *Fazzolari v. Portland School Dist. No. 1J*, 303 Or 1, 17, 734 P2d 1326 (1987), where the court stated:

> "[U]nless the parties invoke a status, a relationship, or a particular standard of conduct that creates, defines, or limits the defendant's duty, the issue of liability for harm actually resulting from defendant's conduct properly depends on whether that conduct unreasonably created a foreseeable risk to a protected interest of the kind of harm that befell the plaintiff."

Foreseeability, while offering some nominal logical limit, is conceptually quite broad. At the same time, human economic activity is quite far-reaching. The first, and perhaps most well-known, case to articulate this concern is *Weller & Co. v. Foot & Mouth Disease Research Institute*, (1966) 1 QB 569. Cattle auctioneers brought suit against a research institute that permitted a virus to escape and infect cattle in a rural area. The English court noted the foreseeability of numerous economic harms:

> "*** (I)n an agricultural community the escape of foot and mouth disease virus is a tragedy which can foreseeably affect almost all businesses in that area. The affected beasts must be slaughtered, as must others to whom the

disease may conceivably have spread. Other farmers are prohibited from moving their cattle and may be unable to bring them to market at the most profitable time; transport contractors who make their living by the transport of animals are out of work; dairymen may go short of milk, and sellers of cattle feed suffer loss of business. ***'"

*Ore-Ida Foods v. Indian Head*, 290 Or 909, 918, 627 P2d 469 (1981) (quoting *Weller*, 1 QB at 577).

Those concerns were expressed in a different context in the oft-cited *Stevenson v. East Ohio Gas Co.*, 73 NE2d 200, 203-04 (Ohio Ct App 1946):

"If one who by his negligence is legally responsible for an explosion or a conflagration should be required to respond in damages *** to every one who has suffered an economic loss, by reason of the explosion or conflagration, we might well be appalled by the results that would follow. In the instant case the door would be opened to claims for damages based on delay by all those who may have had contracts with The Bishop & Babcock Company either to deliver materials to the company or to receive from the company the products manufactured by it. Cases might well occur where a manufacturer would be obliged to close down his factory because of the inability of his supplier due to a fire loss to make prompt deliveries; the power company with a contract to supply a factory with electricity would be deprived of the profit which it would have made if the operation of the factory had not been interrupted by reason of fire damage; a man who had a contract to paint a building may not be able to proceed with his work; a salesman who would have sold the products of the factory may be deprived of his commissions; the neighborhood restaurant which relies on the trade of the factory employees may suffer a substantial loss. The claims of workmen for loss of wages who were employed in such a factory and cannot continue to work there because of a fire, represent only a small fraction of the claims which would arise if recovery is allowed in this class of cases."

From these concerns, the economic loss rule emerged as a bar on a plaintiff's recovery for "purely economic loss" caused by a third person, absent the plaintiff establishing the presence of a fact or circumstance that conceptually removed the case from the realm of the concerns for

unbounded litigation that gave rise to the rule—that is, the plaintiff must establish a limiter. *Hale v. Groce*, 304 Or 281, 284, 744 P2d 1289 (1987) (citing *Ore-Ida Foods*, 290 Or 909). The first and most obvious limiter is injury to persons or property.

Damage to a person or property provides an obvious boundary to concerns of *unbounded* liability. Accordingly, the doctrine is inapplicable when the damage is one to person or property.

> "For purposes of the economic loss doctrine, 'economic losses' means 'financial losses,' as distinguished from 'damages for injury to person or property.' [*Harris v. Suniga*, 344 Or 301, 306, 180 P3d 12 (2008)] (citation omitted). Some examples of purely economic losses include a reduced stock price, a monetary gift to a beneficiary, a debt incurred, and return of monies paid. *Id.* at 310. By contrast, when negligence results in personal injury or property damage, the loss is not 'purely economic'—and the economic loss doctrine does not apply—even though the plaintiff may seek compensation for resulting economic losses, such as medical expenses or repair costs. *See id.* at 310 ('Every physical injury to property can be characterized as a species of "economic loss" for the property owner, because every injury diminishes the financial value of the property owner's assets,' but 'the law ordinarily allows the owner of [a] damaged car or residence to recover in negligence from the person who caused the damage.')."

*Lansing v. John Does 1-5*, 300 Or App 803, 807-08, 455 P3d 541 (2019).

In instances where a plaintiff seeks recovery for purely economic losses absent the presence of injury to person or property, the plaintiff must show some other limiter. Frequently, that is an additional source of duty beyond the common law. "'[T]he concept of duty as a limiting principle takes on a greater importance than it does with regard to the recovery of damages for personal injury or property damage.'" *Onita Pacific Corp. v. Trustees of Bronson*, 315 Or 149, 159, 843 P2d 890 (1992) (quoting *Hale*, 304 Or at 284). Accordingly, where recovery for purely economic losses are concerned, to escape the economic loss rule, a plaintiff can

establish "[s]ome source of a duty outside the common law of negligence." *Hale*, 304 Or at 284.

Oregon courts have identified a variety of potential sources for such a duty. Duty can be present in "the nature of the parties' relationship." *Onita Pacific Corp.*, 315 Or at 160. "[T]he crucial aspect of the relationship is not its name, but the roles that the parties assume." *Strader v. Grange Mutual Ins. Co.*, 179 Or App 329, 334, 39 P3d 903, *rev den*, 334 Or 190 (2002). We have also recognized that contract can give rise to a duty. *See, e.g.*, *Harris*, 344 Or at 308; *Onita Pacific Corp.*, 315 Or at 160-61. Duty can be created by statute or ordinance when such legislative action was "intended to create a duty" beyond its goal of simply "protecting the public interest." *Loosli v. City of Salem*, 215 Or App 502, 507, 170 P3d 1084 (2007), *aff'd*, 345 Or 303, 193 P3d 623 (2008); *see also Nearing v. Weaver*, 295 Or 702, 712, 670 P2d 137 (1983). And duty can be created by operation of a court order. *McEvoy v. Helikson*, 277 Or 781, 785, 562 P2d 540 (1977).

No Oregon case, however, has sought to foreclose other potential limiters that might render the economic loss rule inapplicable. Ultimately, the application of the rule cannot be divorced from the pragmatic concerns that birthed it. *Ore-Ida Foods*, 290 Or at 917 ("We believe that the denial by other courts of claims for economic loss arising from injury to third persons, although phrased in terms of lack of foreseeability, duty and proximate cause, actually reflects their policy decision to limit recovery of such damages."). "Even if liability for indirect economic consequences of negligence may in some cases be too broad and open-ended to be endured, care should be taken to see whether that is true in all types of situations; if it is not true, one must examine whether a rule may be fashioned to separate the wheat from the chaff." James, 25 Vand L Rev at 50.

In this case, Georg Fischer argues that Quality Plus seeks to recover, and presented evidence of, purely economic losses that resulted from negligence related to the welding machine: costs and labor to provide replacement welds, lost profits, rent for an idled fabrication shop, cost of an equipment lease for idled equipment, and expenses for removal and replacement of pipes for JH Kelly and Hoffman

Mechanical. Quality Plus responds that, among other things, Georg Fischer ignores the property damage that resulted to the pipes themselves, which means the injury was not *purely* economic in this case. We agree with Quality Plus.

There is evidence in the record from which a trier of fact reasonably could infer that the change to the reference point on the welding machine resulted in damage to tangible physical property: The pipes themselves were incorrectly welded, meaning that those welded pipes no longer were fit for their intended purpose and needed to be replaced. Georg Fischer does not appear to dispute that point but instead argues that the pipes were the property of JH Kelly and therefore were not property damage to Quality Plus.

Under the circumstances of this case, we are not persuaded by that type of ownership distinction. In *Harris*, the court explained that "the concerns that underlie the economic loss doctrine are not implicated when \*\*\* the focus of the claimed negligence is on physical damage to property," even though there is the potential for that damaged property to be transferred to various owners:

> "[T]his court has identified the potentially limitless economic impacts of negligent conduct as the reason for barring claims for economic losses. That concern, however, is rarely present when the claim is for physical damage to real or other tangible property. Unlike economic losses to third parties, which can be indeterminate and potentially unlimited, physical damage to property ordinarily can be ascertained, assessed, and paid. Once a party has paid damages related to the physical injury to property caused by its negligence, its liability is at an end. Plaintiffs do not assert—and, indeed, affirmatively reject—the idea that defendants can or should be liable to more than one subsequent purchaser for the same damage to property. As plaintiffs put it, 'The builder can only be liable for the physical damages his negligence causes. Those damages can never be more than the costs of repairing the building or damage to a particular physical item.'"

344 Or at 312. The court explained that "doctrines such as claim preclusion, contribution, comparative fault, and mitigation of damages will be available in appropriate

circumstances to avoid the obvious unfairness of subjecting a defendant to repeated lawsuits seeking recovery for the same negligent act and the same property damage." *Id*.

Here, as in *Harris*, the concerns underlying the economic loss doctrine are not implicated, because the focus of the claimed negligence is physical property that was damaged while in Quality Plus's possession and control—the incorrectly welded pipes. Regardless of whether those pipes were owned by Quality Plus or were merely in its control for welding purposes, Quality Plus, as a supplier of fabricated goods, had a relationship to the property such that the property damage could be ascertained, assessed, and paid without producing unfairness or subjecting Georg Fischer to repeated lawsuits for the same property damage.

Although this precise issue—damage to property in the hands of a fabricator—has not arisen in Oregon, there is persuasive authority on point. In *Priority Finishing Corp. v. LAL Const. Co., Inc.*, 40 Mass App Ct 719, 720, 667 NE2d 290, 291 (1996), the plaintiff was in the business of custom dyeing and finishing raw fabrics, which were "not owned by the plaintiff but are supplied by clothing manufacturers who specify the amount of yardage to be returned to the manufacturer in a particular color, shade, or tint." During the dyeing process, which required precision in chemical composition, temperature, and timing, the defendants allegedly caused interruptions to the plaintiff's power and water supply that resulted in damage to the cloth being processed. *Id*. The defendants argued that the economic loss doctrine "should bar the plaintiff from recovery because the plaintiff was merely a bailee of the damaged property, and therefore sustained no damage to property which it owned." *Id*. at 721, 667 NE2d at 292.

The court rejected that argument, explaining that, even though a bailee does not own the bailed property, "his possessory interest is sufficient to maintain an action for damages." *Id*. The court held that "[i]n these circumstances, we conclude that the economic loss doctrine does not apply because the plaintiff's pecuniary losses are derived from

physical harm to property for which the plaintiff has a right to recover." *Id.*[2] *See also Damages in Action Against Third Person By Bailor or Bailee*, 8 CJS Bailments § 152 (June 2020 Update) ("While the bailee does not own the bailed property, his or her possessory interest is sufficient to maintain an action for damages."); *Restatement (Third) of Torts: Liab for Econ Harm* § 7 comment c (Am Law Inst 2019) ("If a claimant possesses property without owning it, courts decide whether the resulting interest is 'proprietary' by using a functional test. They ask whether the claimant has control of the property and is responsible for its maintenance and repair. Thus the law frequently allows a lessee or bailee of property to recover for damage to it, but does not allow recovery by a claimant who occupies or holds property under a license that confers less extensive powers and responsibilities.").

We reach a similar result to *Priority Finishing Corp.* on these facts. Here the pipes themselves—regardless of who owned them—provide the conceptual limiter that renders the pragmatic concerns over unbounded litigation that underlie the economic loss rule inapplicable to this case. Because Quality Plus presented evidence that tangible physical property was damaged while in its possession and control, we reject Georg Fischer's contention that it was entitled to a directed verdict based on the doctrine of economic loss.[3]

---

[2] The court cited the *Restatement (Second) of Torts* § 766C comment b (1979), which provides:

"*b. Physical harm to the other.* The rule stated in this Section [that a person ordinarily is not liable for negligent interference with a contract] applies when the plaintiff suffers only pecuniary loss, such as the loss of the financial benefits of a contract or of prospective trade or financial loss through being put to additional expense. If there is physical harm to the person or land or chattels of the plaintiff, the rule stated in this Section does not apply and there may be recovery for negligence that results in physical harm because of the nonperformance of a contract with the plaintiff. (*Cf.* §§ 435B, 499). This recovery is of course subject to the usual rules governing liability for negligence. When recovery is allowed, the loss of expected profits or other pecuniary loss may, in an appropriate case, be recovered as 'parasitic' compensatory damages."

[3] Because we agree with Quality Plus that its claim was not for purely economic loss, we do not reach its alternative contention that there was a source of duty outside the common law by virtue of its relationship with Georg Fischer that could give rise to a claim for purely economic loss.

2.  *Second assignment: direct negligence*

In its second assignment of error, Georg Fisher argues that the trial court erred in denying its motion for a directed verdict on the question of its direct negligence, because Quality Plus failed to present evidence to support its allegation that Georg Fischer breached duties to Quality Plus to "properly educate, train, control the use of the +GF+ key, and provide the field extension" in a manner that would not result in changing the machine's reference point.

According to Georg Fischer, the evidence at trial showed that Plastic Services employees, McCormack and Westbrook, were both fully trained that only a Level III technician was to have the +GF+ key and perform the field service. It was *despite* that training, Georg Fischer argues, that McCormack gave his service key to Westbrook and directed Westbrook to perform the field extension.

As Quality Plus points out, its direct negligence claim was not limited to Georg Fischer's inadequate training of service technicians. Its complaint alleged more generally that Georg Fischer's field extension program was implemented without the necessary features to prevent an inadvertent and undetectable change in the reference point on the IR-225 machine. Among other things, the complaint alleged that "[t]he reference point change was not detected, as all welds performed during that timeframe were visually acceptable and were accepted," "[t]he problem with the welds performed between January 16, 2014 through July 14, 2014, could be detected only through destructive 'rest-melt' testing by Fischer at its facility," and "[t]he Third Party Defendants failed to meet the appropriate standard of care and were negligent in educating, training, controlling the use of the +GF+ key, and failing to provide the field extension, without improperly changing the reference point, leading to property damage ***."

To support that allegation, Quality Plus presented evidence that Georg Fisher trained Quality Plus's welders to proceed through a critical step of the welding process on the IR-225 machine based on a subjective standard—whether more than "two finger" pressure was necessary to zero out

the machine—and that welders could proceed with the welding process merely by using additional pressure; that the machine itself would not produce any error codes showing a change in the reference point or that additional pressure had been necessary to zero out the machine; that welds would continue to pass visual inspection by the welders even after the reference point had been changed to produce compromised welds; and that Georg Fischer never ensured that a "rest melt" was made after the field extension was performed, which would have revealed the change in reference point. Wilcke, who was the shop supervisor at Quality Plus, testified that, following the field extension, he did not further investigate complaints from one of his welders about the pressure necessary to zero out the machine because it had recently been serviced and certified through the field extension process.

From that and other proffered evidence about the nature of the welding machine and the importance of the reference point to the welding process, a reasonable trier of fact could infer that Georg Fischer implemented its field extension program without the necessary safeguards—whether in terms of educating and training its end users, or post-service testing—to ensure that any change to the reference point during that process would be discovered by the user before welding, and that its failure in that regard created an unreasonable risk of the very harm that befell Quality Plus in this case. On this record, the trial court did not err in denying Georg Fischer's motion for a directed verdict on the direct negligence claim.

3. *Third assignment: vicarious liability*

Georg Fischer's next assignment of error concerns Quality Plus's theory of indirect liability. Quality Plus alleged and argued at trial that Plastic Services was acting on Georg Fischer's behalf in carrying out the field extension for Quality Plus. According to Georg Fischer, the court should have directed a verdict against Quality Plus on that theory because there was no evidence to establish that it controlled the manner in which Plastic Services performed the service.

Generally speaking, to be an "'agent'—using the well-defined legal meaning of that term—two requirements must be met: (1) the individual must be subject to another's control; and (2) the individual must 'act on behalf of' the other person." *Vaughn v. First Transit, Inc.*, 346 Or 128, 136, 206 P3d 181 (2009). A principal's liability for the acts of its agents depends on the type of relationship involved. Where the relationship involves an "employee agent," the principal is liable for acts committed within the scope of employment. *Id.* at 137. Where a tort is committed by a nonemployee agent, the principal is liable if the principal intended or authorized the result or the manner of performance of the tortious act. *Id.* at 138. "In other words, for a principal to be vicariously liable for the negligence of its nonemployee agents, there ordinarily must be a connection between the principal's 'right to control' the agent's actions and the specific conduct giving rise to the tort claim." *Id.* "Put differently, only when the principal's control over the agent with respect to the actions of the agent that gave rise to the tort claim is similar to the control that an employer exercises over an employee will the principal be vicariously liable for the negligence of its nonemployee agent." *Id.* at 139; *see Scheffel v. Oregon Beta Chapter of Phi Kappa Psi*, 273 Or App 390, 419, 359 P3d 436 (2015) ("To impose vicarious liability for a nonemployee agent's physical conduct, the principal must have—or appear to have—a right to control how the act is performed—that is, the physical details of the manner of performance—that is characteristic of an employee-employer relationship."). Although "[t]he relationship between two business entities is not precisely an employment relationship," the "right to control test for vicarious liability" applies in that context as well. *Miller v. McDonald's Corp.*, 150 Or App 274, 279, 945 P2d 1107 (1997).

Georg Fischer contends that Plastic Services was neither its employee agent nor nonemployee agent, and that it did not control the details of the manner in which Plastic Services performed the field extension. Quality Plus responds that there is evidence in the record from which the jury could find otherwise: that Georg Fischer agreed that Plastic Services would act on behalf of Georg Fischer in servicing Georg Fischer's customers, and that Georg Fischer

maintained tight control over the way Plastic Services performed in that regard, in a manner that is characteristic of the employee-employer relationship. We agree with Quality Plus.

There is evidence in the record from which a jury could infer that the relationship between Georg Fischer and Plastic Services, for purposes of the field extension program, went beyond that of manufacturer and distributor and was characteristic of an employer-employee relationship. Georg Fischer's instruction manual for the welding machine (the "Instruction Manual") includes a section titled "Servicing and Maintenance," and it states, "[i]n order to provide our customers with an operational fusion machine as quickly as possible in case of necessary repairs, Georg Fischer has established a worldwide service network." The Instruction Manual further provides that "[t]his modern service organization begins at the user/customer and continues via Georg Fischer Maintenance Centers to Georg Fischer Service Centers."

The "Servicing and Maintenance" section of the Instruction Manual includes a subsection titled "Structure and Organization." It provides, in part, "Georg Fischer Maintenance Centers include +GF+ maintenance personnel at Level III *as well as authorized dealers / outside sources, who take on service maintenance jobs at the request of Georg Fischer. Only these persons receive a service key, which permits them to carry out 'repairs requiring a service key.'*" (Emphasis added.) The manual further refers to the Maintenance Centers as being within the "Structure of the Georg Fischer service organization."

The Georg Fischer Service and Maintenance Manual for Level III ("Service Manual"), along with the training and certification program for Level III maintenance personnel, reflect a detailed level of control over who is authorized to conduct Level III repairs as part of Georg Fischer's service network, as well as a high degree of control over how those repairs are conducted. The Service Manual includes instructions for servicing machines, organizational flow charts for service, and requirements for reporting "Key required field repair" to Georg Fischer's service center. And,

to obtain certification and obtain a +GF+ key, a technician must take a training program from Georg Fischer and pass a test that includes 35 questions about the service of GF welding machines. As an example, the test asks, "You have a machine that after facing the reading is -.030mm, what should you do first? ___ Check that all the screws are tight ___ Do a zero point adjustment ___ Do a gap check ___ Call service center ___ Send the machine back in for repair."

The record allows a reasonable inference that the field extension program was among those service jobs that are undertaken by authorized dealers "at the request of Georg Fischer," and that Georg Fischer retained the same degree of control over the manner of performance by its distributors' Level III service technicians as it did over its own Level III-trained employees. The record reflects that the field extension program was developed by Georg Fischer as a convenience for itself and its customers, whereby certain authorized companies like Plastic Services would perform field extensions rather than requiring the customer to send the machines back to service centers. Georg Fischer determined who was authorized to conduct the field extension program based on its own training and certification requirements, including who was permitted to have the +GF+ key necessary to perform the extension; it remained involved throughout the extension process, requiring that Plastic Services send test welds directly to Georg Fischer to be tested; and it was Georg Fischer that ultimately determined whether to allow the extension of the weld cycle.

Viewed as a whole, the evidence would permit a jury to find that Georg Fischer retained control over the manner of performance of the field extension program to a degree that is characteristic of the employee-employer relationship, and that Plastic Services was acting as Georg Fischer's agent when it negligently carried out the field extension service. *See Miller*, 150 Or App at 281 (holding that franchisor could be held vicariously liable for the negligent food handling and preparation of the franchisee's employees because the franchisor established the methods for food handling and preparation and enforced the use of those particular methods through regular inspections and the right to cancel the

agreement). Therefore, the trial court did not err in denying Georg Fischer's motion for a directed verdict on the question of vicarious liability.

### 4.   *Fourth assignment: breach of contract*

Georg Fischer's fourth assignment of error asserts that the trial court should have directed a verdict on Quality Plus's claim for breach of contract. As we understand the assignment, it is dependent on the same argument that Georg Fischer advances with regard to vicarious liability on the negligence claim: that there is no evidence that Plastic Services was acting as an agent of Georg Fischer in performing the field extension. For reasons previously stated, we disagree with that contention. Accordingly, we reject the fourth assignment of error.[4]

### 5.   *Fifth assignment: lost profits*

Next, Georg Fischer argues that the trial court should have granted its motion for a directed verdict on Quality Plus's claim for lost profits, because there was no evidence to support that claim. When reviewing the court's refusal to withdraw the issue of lost profits from the jury, "the question is whether there was evidence in the record to permit a finding of *some* net lost profits." *GPL Treatment, Ltd. v. Louisiana-Pacific Corp.*, 133 Or App 633, 637, 894 P2d 470 (1995), *aff'd*, 323 Or 116, 914 P2d 682 (1996) (emphasis in original).

As we recently explained in *Summa Real Estate Group, Inc. v. Horst*, 303 Or App 415, 423, 464 P3d 483 (2020), a party seeking lost profits "must establish with reasonable certainty the existence and amount of lost profits." (Quoting *Peterson v. McCavic*, 249 Or App 343, 354, 277 P3d 572, *rev den*, 352 Or 564 (2012) (internal quotation marks and brackets omitted.)). The "reasonable certainty" standard, we

---

[4] It is not entirely clear from Georg Fischer's briefing whether it is advancing any argument that is independent of the agency question, so we limit our analysis to whether there was evidence to support a claim that Plastic Services was acting as Georg Fischer's agent when performing the field extension. *See Beall Transport Equipment Co. v. Southern Pacific*, 186 Or App 696, 700 n 2, 64 P3d 1193, *adh'd to on recons*, 187 Or App 472, 68 P3d 259 (2003) (explaining that we will not speculate as to what a party's argument might be and that it is not "our proper function to make or develop a party's argument when that party has not endeavored to do so itself").

have held, is "not a demanding standard"; it requires "reasonable probability," not "absolute certainty." *City of Eugene v. Monaco*, 171 Or App 681, 688, 17 P3d 544 (2000), *rev den*, 332 Or 240 (2001). At the same time, a plaintiff must present more than speculative or unverifiable estimates of loss. *See Willamette Quarries v. Wodtli*, 308 Or 406, 412, 781 P2d 1196 (1989) ("Lost profits or sales, however, are not proved merely by testimony of unverifiable expectations of profits."); *Buck v. Mueller*, 221 Or 271, 282, 351 P2d 61 (1960) ("[L]oss of profits must not be uncertain and speculative.").

In support of its claim for lost profits, Quality Plus presented testimony from its office manager, Sean Carey, and its president, Frank Gay. Carey testified that, as a result of the weld replacement issue at Intel, "our work went off a cliff. We've done virtually none of this work or very little of this work since"—not just plastic pipe fusion, but process mechanical work more broadly. He testified that other contractors have continued doing "process mechanical [work]. We're aware of it. We just can't get it."

Carey testified that the construction business is cyclical, so to calculate lost profits he took Quality Plus's past performance—dating back to 2011—and averaged the performance leading up to the peaks and performance after the peaks to estimate an average decline of 7.8 percent after the peaks. He "then applied that to our average revenue numbers to calculate what we could have expected coming off of this last peak," assumed a 21-month period of anticipated market decline (from August 2014 to the date of trial), and applied an assumed profit margin of 7.5 percent. He explained that he used that profit margin of 7.5 because "[t]hat's what we run on average. *** It's an industry norm, conservative number also."

Based on his assumed decline in the market over those 21 months, Carey estimated an average expected revenue around $2.78 million per month during that time, translating to $18.7 million in lost revenue. And based on a 7.5 percent profit margin, and accounting for the percentage of the business that was mechanical as opposed to electrical work (26.3 percent), Carey testified that Quality Plus had lost $369,618 in profits as a result of the welding problems.

Gay similarly testified that Quality Plus's profit margin "[f]or this type of work, it's seven and a half percent," and that the welding issues resulted in a loss of 26.3 percent of their overall business. He, like Carey, testified that Quality Plus's fusion business went to "zero" after the problems on the Intel project, and that he was aware of other plastic fusion work still going on in the region based on his discussions with people in the industry.[5]

According to Georg Fischer, that evidence of lost profits was legally insufficient because Carey also acknowledged (1) that there are many factors that can influence whether Quality Plus's profits go up or down, and (2) that he had not specifically analyzed causation. Georg Fischer also argues that Quality Plus did not present evidence "of any specific contracts or other business [Quality Plus] lost that is directly attributable to the Intel incident."

Quality Plus was not required to disprove every possible cause of its decline in profits. Rather, it was required to establish with "reasonably certainty" the existence and amount of its lost profits. It did that here: The testimony permitted a reasonable inference that Quality Plus's once-profitable business in welding went to zero after the incident, and it does not require speculation to conclude that the damage to its reputation was the reason. And, the evidence of the historical performance of Quality Plus's business, plus the projections of its office manager based on his industry experience, allowed the jury to determine the amount of those profits to a reasonable certainty. *See Buck*, 221 Or at 283 ("It is not a sufficient reason for disallowing damages claimed that they cannot be exactly calculated. It is sufficient if, from proximate estimates of witnesses, a satisfactory conclusion can be reached * * *. Past profits may be shown if they reflect the operation of an established business." (Internal quotation marks and citations omitted.)). Accordingly, we reject Georg Fischer' fifth assignment of error.

---

[5] Various other witnesses testified that, despite suggestions to the contrary from some witnesses about the downturn in the market, there was welding work and "Fischer work to be had."

6.  *Eighth assignment: prejudgment interest*

After the jury returned its verdict of $2,024,715.44 on the negligence claim, Quality Plus asked the court to award prejudgment interest on part of that amount. In Quality Plus's view, even though the verdict reflects a lump sum, it was apparent from the amount that the jury had awarded (1) $450,000 that Quality Plus paid in settlement to JH Kelly on March 16, 2016; (2) $822,553.10 that was part of the amount withheld by Hoffman Mechanical as of December 18, 2014, and finally negotiated by QPS and Hoffman Mechanical by January 2016; (3) $382,544.34 in Quality Plus's own expenses, incurred by June 15, 2016; and (4) $369,618 in lost profits, since each of those amounts was broken out on a trial exhibit and totaled exactly $2,024,715.44.[6] Quality Plus argued that it was entitled to prejudgment interest on all but the amount of lost profits, running from the latest date, June 15, 2016, because the amount due to Quality Plus was readily ascertainable by that date. *See* ORS 82.010(1)(a) (authorizing an award of interest on "[a]ll moneys after they become due"). Over Georg Fischer's objection, the trial court agreed with Quality Plus and awarded prejudgment interest.

On appeal, Georg Fischer's primary argument is that Quality Plus failed to adequately plead the facts giving rise to a claim for prejudgment interest in its third-party complaint. However, Georg Fischer fails to point out where it raised that pleading issue below, and we decline to address it for the first time on appeal. *See* ORAP 5.45(1) ("No matter claimed as error will be considered on appeal unless the claim of error was preserved in the lower court and is assigned as error in the opening brief in accordance with this rule, provided that the appellate court may, in its discretion, consider a plain error.").[7]

---

[6] Quality Plus's prayer, and the trial exhibit, also included amounts for its idled fabrication shop ($216,909.00) and lease expenses for idled equipment ($658,995.75) as damages.

[7] In its reply brief, Georg Fischer invokes *Stull v. Hoke*, 326 Or 72, 77, 948 P2d 722 (1997), and argues that, because it preserved the general issue of entitlement to prejudgment interest under ORS 82.010(1)(a), it can now advance new arguments about the statute that were not made below. As we recently reiterated in *State v. Laune*, 303 Or App 541, 545 n 4, 464 P3d 459 (2020), our responsibility

Next, Georg Fischer argues that the court erred in awarding prejudgment interest because Quality Plus did not prove that certain amounts of money due were due from Georg Fischer at certain times, and that Georg Fischer breached its duty to pay on those dates. We review the trial court's award of prejudgment interest for errors of law. *Tasaki v. Moriarty*, 233 Or App 51, 55, 225 P3d 68 (2009).

We recently summarized the legal principles governing an award of prejudgment interest:

> "[I]n the absence of an agreement to pay interest, interest can be recovered only in those circumstances authorized by statute. *Strawn v. Farmers Ins. Co.*, 353 Or 210, 239, 297 P3d 439 (2013). Here, the trial court relied on ORS 82.010(1)(a), which authorizes an award of interest on all moneys after they become due. Whether a court can award prejudgment interest usually reduces to whether the amount due was readily ascertainable. *Strawn*, 353 Or at 239. That generally means that prejudgment interest is only awarded when the exact amount is ascertainable or easily ascertainable by simple computation or by reference to generally recognized standards * * * and where the time from which interest should run is also easily ascertainable. *Strader v. Grange Mutual Ins. Co.*, 179 Or App 329, 338, 39 P3d 903, *rev den*, 334 Or 190 (2002)."

*Patton v. Mutual of Enumclaw Ins. Co.*, 296 Or App 266, 272, 438 P3d 441, *rev den*, 365 Or 533, *and rev den*, 365 Or 657 (2019) (internal quotation marks and some citations omitted).

"We have held, on several occasions, that even though damages are not ascertainable until issues of fact have been decided, prejudgment interest is proper." *Goodyear Tire & Rubber Co. v. Tualatin Tire & Auto*, 129 Or App 206, 218, 879 P2d 193 (1994), *rev'd in part on other grounds*, 322 Or 406, 908 P2d 300 (1995), *modified on recons*, 325 Or 46,

---

to correctly construe the statute as described in *Stull* arises "when the parties have put the issue of statutory interpretation before us by disagreeing as to what a statute means; in such situations, we are not limited to choosing the better of two erroneous interpretations. * * * [T]he parties are still responsible for preserving arguments in a way that places the correct statutory interpretation at issue." (Internal quotation marks and citation omitted.) Georg Fischer's arguments below did not raise any issues that put a pleading requirement of the statute before us.

932 P2d 1141 (1997) (citing cases). Our decision in *Strader* is one of the most cited on that point. In that case, the plaintiffs prevailed on a claim for breach of an insurance contract, after proving that the defendant insurer had not met its obligation under the policy to pay compensation sufficient to cover repair of the roof and water damage; the trial court awarded prejudgment interest on the difference between what the insurer paid and what the jury ultimately awarded. 179 Or App at 332. On appeal, the defendant argued that the amount owed was not ascertained or easily ascertainable because "plaintiffs submitted different amounts at different times before and during trial" and "the amount plaintiffs ultimately pleaded differed from the amount defendant offered and both these amounts differed from the jury's determination." *Id.* at 338. "[I]n other words," the defendant based "its argument entirely on the proposition that, unless the parties agree as to the amount of damages or the amount derives from the automatic application of an agreed-upon formula, prejudgment interest is improper." *Id.*

We rejected that narrow formulation, explaining that, although a number of cases had suggested as much, our subsequent decision in *Banister Continental Corp. v. NW Pipeline Corp.*, 76 Or App 282, 293, 709 P2d 1103 (1985), *vac'd*, 301 Or 763, 724 P2d 822 (1986), had charted a different path and adopted "instead a conflicting line of cases holding unequivocally that '[t]he facts that defendant disputed any liability and that the jury did not award plaintiff all the damages that it sought are insufficient grounds to deny prejudgment interest.'" *Strader*, 179 Or App at 339. *See also id.* (explaining that we had since "repeatedly reaffirmed" *Banister*'s holding and that, "[b]y now, it is well settled that, 'even though damages are not ascertainable until issues of fact have been decided [by the jury], prejudgment interest is proper.'" (Quoting *Goodyear Tire & Rubber Co.*, 129 Or App at 218.)).

Subsequently, we explained in *L. H. Morris Electric v. Hyundai Semiconductor*, 203 Or App 54, 78, 125 P3d 87 (2005), *rev den*, 341 Or 140 (2006), that the "readily ascertainable" inquiry includes the benefit of post-verdict hindsight: "[W]e do not operate from the perspective of the parties during litigation but from an objective, post-judgment

perspective." (Citing *Strader*, 179 Or App at 339.) *Accord Strawn*, 353 Or at 240 ("Litigation may be necessary to determine that the duty to pay or return money has been breached. But if a plaintiff prevails in such an action, the breach does not occur at the time of judgment. It is, instead, a past event."); *Farhang v. Kariminaser*, 232 Or App 353, 356, 222 P3d 712 (2009) ("[T]he trial court could have awarded prejudgment interest only if there were no disputed facts *after the jury returned its verdict*, and the court could have easily calculated the prejudgment interest based on the undisputed facts." (Emphasis added.)).

Using the lens described in *Strader* and *L. H. Morris Electric*, we conclude that the trial court did not err in determining that parts of the award were "readily ascertainable" for purposes of awarding prejudgment interest. Once the jury determined Georg Fischer's liability, its degree of fault, and the amount of damages in a way that clearly corresponded with amounts owing at dates certain, the trial court was in a position to determine prejudgment interest "'by simple computation[.]'" *Patton*, 296 Or App at 272 (quoting *Strader*). And, contrary to Georg Fischer's suggestion, the fact that the claim was in tort rather than contract is not determinative; it is "the character of the damages, not of the cause of action, that is the determinative factor in awarding prejudgment interest." *See Bollam v. Fireman's Fund Ins. Co.*, 76 Or App 267, 276, 709 P2d 1095 (1985), *rev'd on other grounds*, 302 Or 343, 730 P2d 542 (1986).[8] Accordingly, we reject Georg Fischer's eighth assignment.

---

[8] Although Georg Fischer points out that the damages were awarded for a tort claim, it does not develop any argument regarding the role that comparative fault plays in the analysis under Oregon law—a novel question that we do not address in the absence of a developed argument on that point. *Compare Precision Heavy Haul, Inc. v. Trail King Indus., Inc.*, 224 Ariz 159, 161-62, 228 P3d 895, 897-98 (Ct App 2010) (describing the "impact of comparative negligence upon liquidated damages" as a novel issue in Arizona, noting the different approaches taken by courts in other jurisdictions, and observing that "our case law has established that uncertainty about a defendant's liability, even when a trial is necessary to establish the extent of liability for the plaintiff's damages, does not preclude such a plaintiff from receiving prejudgment interest"), *with Wisper Corp. N.V. v. California Commerce Bank*, 49 Cal App 4th 948, 962, 57 Cal Rptr 2d 141, 149 (1996) (holding that the plaintiff was not entitled to an award of prejudgment interest under California statute, because the jury's finding of

B.  *Quality Plus's Cross-Appeal*

Having rejected the issues raised in Georg Fischer's appeal, we turn to Quality Plus's cross-appeal, in which it raises a single assignment of error: that the court erred in directing a verdict against its claim to recover attorney fees and costs and expenses arising from its defense of claims brought against it by JH Kelly, which had settled out of the case by that point. As explained below, we agree with the trial court's conclusion that the standalone claim for attorney fees was not cognizable under Oregon law.

In its third-party complaint, Quality Plus pleaded an entitlement to attorney fees as a standalone claim for relief rather than as damages on its negligence claim. Quality Plus acknowledged below that the claim was a novel one, but that the potential availability of recovery for its fees and expenses as a standalone claim was recognized by the Supreme Court in *Eclectic Investment, LLC v. Patterson*, 357 Or 25, 39, 346 P3d 468, *adh'd to as modified on recons*, 357 Or 327, 354 P3d 678 (2015).

In *Eclectic Investment*, Jackson County was a defendant in a negligence action in which the plaintiff alleged that the county had damaged the plaintiff's real property. The county asserted that the plaintiff's own negligence caused the damages but also filed a cross-claim for common-law indemnity against a contractor that was a codefendant. The jury found that the plaintiff was more than 50 percent at fault, so neither the county nor the contractor was liable to the plaintiff. However, because the county had incurred costs in defending against the plaintiff's claim, it pursued its cross-claim for indemnity to collect those costs from the contractor. 357 Or at 27.

The Supreme Court held that the county's claim for common-law indemnity was inconsistent with Oregon's comprehensive statutory system for allocating fault between the parties and distributing liability for damages severally in accordance with that allocation. 357 Or at 36. However, footnote nine of the opinion explicitly left open the possibility

comparative fault meant that "[t]he amount of damage could not be determined until after trial").

that litigation expenses and fees might be recoverable from a third party in certain circumstances:

> "We do not decide whether a prevailing defendant may be permitted to recover its costs of defense from another tortfeasor on a theory other than common-law indemnity. Although this court has not expressly addressed the question, other jurisdictions have permitted tort claims to recover such costs in limited circumstances. *See Restatement (Second) of Torts* § 914 (1979) ("One who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a third person is entitled to recover reasonable compensation for loss of time, attorney fees and other expenditures thereby suffered or incurred in the earlier action."); *see generally, Rocky Mountain Festivals, Inc. v. Parsons Corp.*, 242 P3d 1067, 1071 (Colo 2010) (acknowledging that "the litigation costs incurred by a party in separate litigation may sometimes be an appropriate measure of compensatory damages against another party"); *Taylor v. S. Pac. Transp. Co.*, 130 Ariz 516, 523, 637 P2d 726 (1981) (permitting plaintiff to recover costs and expenses of litigation necessary to protect his interest where wrongful act of defendant involved plaintiff in litigation). *However, such actions do not lie unless the third-party action that the plaintiff was required to defend against existed only because of the tort of the defendant. Restatement § 914 comment b.*[9]

> "Here, the county's cross-claim was not a tort claim against the contractor alleging that the contractor had committed a tort that required the county to protect its interests by defending a claim brought by plaintiff or *that plaintiff's claim against the county existed only because of the tort of the contractor*. Rather, plaintiff alleged that the county was liable for its own negligence."

357 Or at 39 n 9 (emphases added).

---

⁹ Comment b provides:

> "The rule stated in this Subsection applies when the preceding action was brought against the present plaintiff either by a third person or by the state, and also when the present plaintiff has been led by the defendant's tort to take legal proceedings against a third person. When a cause of action or an alleged cause of action against the defendant in a proceeding exists only because of a tort of another, the defendant can notify the other to defend the proceeding and if the other fails to defend the defendant can either defend, subsequently recovering all the reasonable expenses of the defense, or refuse to defend, in which case he can recover from the tortfeasor the amount of any judgment obtained against him."

Notwithstanding that footnote, Georg Fischer and Plastic Services moved for a directed verdict on the attorney-fee claim, arguing that there is no standalone claim for attorney fees and expenses from a codefendant; alternatively, relying on the emphasized text above, it argued that such a claim would be cognizable only if Quality Plus was sued by JH Kelly *solely* as a result of its own negligence, which was not the case because Quality Plus "does have some degree of negligence in this."

For its part, Quality Plus agreed that "this is a new idea" and "that there's no Oregon case ruling one way or the other" on the existence of the standalone claim, but it argued that the question of entitlement should go to the jury as its own claim.[10] However, it essentially conceded that it was required to prove that it had zero fault in order to recover:

> "But, yes, we think that the entitlement to it should go to the jury. And to the extent that there's a question about whether or not QPS is—Quality Plus is—that whether or not we can meet the standard for the causation test, we agree that the—the standard is: *Was it wholly caused by the defendant's negligence. And that's in our proposed verdict form is that's the question: Was it wholly caused by them? I believe it was.* It should be in here. *Anyway, we agree that that's the standard, but that's—again, that's for the jury.*"[11]

The court ultimately ruled that the issue of entitlement should not go to the jury, and it granted the directed verdict on the ground that the claim did not state "a cause of action."

On appeal, Quality Plus raises a somewhat different argument from what it advanced below. It continues to argue that footnote nine in *Eclectic Investment* and the corresponding *Restatement* provision contemplate the existence of a standalone claim, but it now appears to walk back from its concession that Georg Fischer and Plastic Services must have "wholly caused" the JH Kelly action. Instead, Quality

---

[10] Earlier, the court had ruled that regardless of entitlement, the amount of any fees recovered should be decided by the court under the ORCP 68 procedure after trial. That aspect of the attorney-fee claim is not at issue on appeal.

[11] Consistent with its pleading, Quality Plus's proposed verdict form included a separate claim for the jury to consider with regard to attorney fees.

Plus points out that one of the cases cited in the footnote, *Rocky Mountain Festivals, Inc.*, 242 P3d 1067, allowed a party to recover attorney fees notwithstanding its own fault in the underlying third-party litigation.

*Rocky Mountain Festivals, Inc.*, is instructive, but not for the reason Quality Plus argues. In that case, the Colorado Supreme Court addressed the "narrow issue of whether litigation costs and attorneys' fees should be recoverable under the wrong-of-another doctrine where a plaintiff has not been entirely successful on all its claims in the underlying litigation." 242 P3d at 1069. The court began its analysis by "clarifying the operation of the wrong-of-another doctrine and discussing those circumstances in which an injured party may seek litigation costs and attorneys' fees *as a measure of damages*." *Id.* at 1070 (emphasis added). In the process, the court rejected the very premise of Quality Plus's contention—that the "wrong-of-another doctrine" provides the basis for a standalone claim—and, beyond that, it cited an Oregon Supreme Court case for that proposition:

> "Despite its long history in Colorado, the record developed below lays bare some confusion as to the application and operation of the wrong-of-another doctrine. *The doctrine does not establish a stand-alone cause of action*, see *Kamyr, Inc. v. Boise Cascade Corp.*, 268 Or 130, 519 P2d 1031 (1974), nor is it an exception to the so-called American rule that parties are responsible for their own litigation costs and fees. Rather, the doctrine is but an acknowledgement that the litigation costs incurred by a party in separate litigation may sometimes be an appropriate measure of compensatory damages against another party."

242 P3d at 1071 (emphasis added; footnotes omitted).

The Colorado court, "[h]aving clarified that the wrong-of-another doctrine is not a separate tort but instead merely frames certain claims for damages," *id.* at 1074, explained that the availability of "wrong-of-another" damages for a partially at-fault litigant depends on whether those damages can be traced to the defendant's wrongful conduct:

> "Applying the distinction to the wrong-of-another circumstance at issue here, where the claims for which a

plaintiff seeks wrong-of-another damages cannot be conceptually distinguished from the remainder of the underlying dispute, no award tailored to a subset of claims shall issue. If, however, the subset of claims for which a plaintiff seeks litigation costs was founded in a distinct core of facts and premised on distinct legal theories, the plaintiff can attempt to show the subset is uniquely traceable to the defendant's alleged wrong, and so seek costs incurred by litigating those claims. *Of course, his ultimate success in such an action relies upon his ability to establish those elements of the tort or contract theory on which his claim for wrong-of-another damages is premised.*"

*Id.* at 1073-74 (emphasis added).

As the court's citation to *Kamyr* indicates, the Oregon Supreme Court has already explained that the wrong-of-another rule described in *Restatement* section 914 is not the source of a standalone claim. In *Kamyr*, the court said that "[t]he rule as stated is a rule of damages and not a rule of liability. An examination of the location of section 914 in the Restatement demonstrates that it is in the section on damages." 268 Or at 136.

Given *Kamyr* and the citation to *Rocky Mountain Festivals, Inc.*, in footnote nine of *Eclectic Investment*, we do not understand that footnote to refer to the availability of a standalone claim.[12] Rather, it refers to the possibility that attorney fees and expenses may be available as an *element of damages* under particular circumstances. *Accord State v. Ramos*, 358 Or 581, 600, 368 P3d 446 (2016) ("[W]hen a plaintiff brings a claim against a defendant for damages, the plaintiff may seek, as an element of damages, attorney fees and costs that the plaintiff incurred in litigation with a third party."); *Montara Owners Assn. v. La Noue Development, LLC*, 357 Or 333, 361 n 15, 353 P3d 563 (2015) ("The third-party litigation exception to the American rule [that parties pay their own attorney fees] has been adopted by almost every jurisdiction in the United States. *** It might be more accurate to say that a claim for attorney fees as consequential damages for another party's wrongful

_____

[12] Although *Kamyr* was not cited in footnote nine, it was cited and discussed in *Eclectic Investment*, on a different point. *See* 357 Or at 34 n 5 (discussing indemnity).

conduct is simply a situation in which the American rule does not apply, rather than an 'exception' to the rule."); *Huffstutter v. Lind*, 250 Or 295, 301, 442 P2d 227 (1968) ("[A]ttorney fees are generally allowable as damages in an action against a defendant where the defendant's tortious or wrongful conduct involved the plaintiff in prior litigation with a third party.").

In this case, Quality Plus sought attorney fees as a standalone claim, and the trial court correctly ruled that Oregon law does not recognize such a claim. *Kamyr*, 268 Or at 136. We therefore reject Quality Plus's assignment of error on cross-appeal.[13]

Affirmed on appeal and cross-appeal.

---

[13] Quality Plus's assignment of error is directed solely at the court's ruling as to the standalone claim. We express no opinion on whether, on these facts, Quality Plus would have been entitled to recover attorney fees as a measure of damages on its negligence claim—an issue that is not presented in light of the way that this case has been litigated.